UNITED STATES of America,
Plaintiff-Appellee,

v.

Jose GARCIA and Francisco Garcia,
Defendants-Appellants.

No. 82–5048.

United States Court of Appeals,
Eleventh Circuit.

Nov. 7, 1983.

Neal A. Dupree, Asst. Federal Public Defender, Charles White, Miami, Fla., for defendants-appellants.

Stanley Marcus, U.S. Atty., Sari B. Marmur, Linda Collins Hertz, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before FAY and KRAVITCH, Circuit Judges, and ATKINS *, District Judge.

ATKINS, District Judge:

Jose Garcia and Francisco Garcia were convicted of multiple counts charging (a) stealing and robbing money of the United

---

\* Honorable C. Clyde Atkins, U.S. District Court Judge for the Southern District of Florida, sitting by designation.

States by use of a pistol, (b) conspiracy to steal, (c) possession of counterfeit Federal Reserve notes and (d) assaulting a Secret Service Agent with a loaded pistol. Jose was found guilty on all counts. Francisco was convicted of all but Count V relating to the assault. The Garcias raised issues dealing with a "postal nexus" as an essential element of the property stolen; Counts II, III and V having the same elements, precluding consecutive sentences; the admissibility of the counterfeit bills; and the sufficiency of the evidence. Finding no requirement of a "postal nexus" as an essential element, the counterfeit bills were properly admitted in evidence, consecutive sentences were correctly imposed under 18 U.S.C. §§ 2114, 641 and 111, and that the evidence supports the convictions, we affirm.

## THE FACTS

The facts are not substantially in dispute.

On July 22, 1981, Special Agent K. David Holmes, posed as someone interested in buying counterfeit money with genuine currency. Accompanied by a confidential informant named Jorge Castro, Agent Holmes went to Douglas Park in Miami, Florida, to meet the individuals with whom he would conduct negotiations for the purchase of counterfeit money (T 13). Informant Castro introduced Agent Holmes to Ernesto Dominguez and Appellant Francisco Garcia (T 14) as the purchaser of the counterfeit money (T 15). Dominguez asked Holmes whether he had brought the genuine currency. Agent Holmes responded affirmatively (T 15). When Agent Holmes asked Dominguez if they had the counterfeit, Dominguez responded that the counterfeit was in the trunk of the white Trans-Am in which the defendants had arrived at Douglas Park (T 15–16). The Trans-Am was parked a few spaces away from where Agent Holmes had parked his government vehicle.

Dominguez walked over to the Trans-Am, followed shortly thereafter by Agent Holmes (T 16). Appellant Jose Garcia was seated in the driver's seat of the Trans-Am (T 17). When Agent Holmes told Appellant Jose Garcia that he wanted to do the deal, Jose Garcia stated he was not going to count phony bills there because the "place" (Douglas Park) was "sort of heated up" (T 18). The defendants wanted to see the genuine currency before displaying the counterfeit (T 18). At that point, Agent Holmes flashed the $1,800 of government money to Dominguez, while Jose Garcia remained seated in the Trans-Am and Francisco Garcia remained standing near Agent Holmes' vehicle (T 19).

Agent Holmes returned to his vehicle, followed by Dominguez. Agent Holmes once again stated that he wanted to do the deal there, but Dominguez reiterated that the place was "heated up" and said they could do the deal in another location (T 720–21). Dominguez and Francisco Garcia returned to the Trans-Am; as the vehicle drove past, they yelled that they were going to Bryant Park (T 21).

When Agent Holmes arrived at Bryant Park, Francisco Garcia and Dominguez were standing outside the Trans-Am. Jose Garcia was seated inside the vehicle (T 37). Dominguez wanted to see the genuine currency again, but Agent Holmes refused (T 41), commenting that he did not think they had any counterfeit; he asked them to show him a sample. Francisco Garcia then gave Agent Holmes a counterfeit $50 bill to examine. Dominguez assured Agent Holmes they had $85,000 in counterfeit currency to sell. Agent Holmes once again asked to see the counterfeit and began walking to his vehicle (T 42–43).

After Agent Holmes had walked about two paces towards his vehicle, Jose Garcia jumped out of the Trans-Am holding a semi-automatic pistol. Jose Garcia pointed the pistol at Agent Holmes, chambered a round into the pistol, assumed a combat stance, gripping the pistol with both hands with his finger in the trigger, pointed the loaded, chambered pistol at Agent Holmes and screamed: "Enough of this bullshit, give me the money" (T 43). Agent Holmes raised his arms in the pre-determined distress signal and began inching his way towards his vehicle, telling Jose Garcia that he was going to get the money (T 44).

Surveillance Agent Null observed Agent Holmes with his hands in the air, the prearranged distress signal which the undercover agent was to give if his life was in danger (T 88–89). While Agents Null and Grant were racing to the scene, Agent Null observed Jose Garcia pointing the pistol at Agent Holmes (T 90). Surveillance Agent Grant also saw Jose Garcia pointing the gun at Agent Holmes (T 97).

Within seconds, Agents Null and Grant arrived and shouted at Jose Garcia to drop the gun. At that point, Jose Garcia dropped the weapon (T 44). Agent Grant recovered the weapon from the ground and disarmed it, determining that one round had been chambered into the pistol (T 99). It was registered to Francisco Garcia (T 125). After disarming Jose Garcia and putting him under arrest, Agent Null conducted a pat-down of defendant Jose Garcia and seized a $100 counterfeit bill, which he immediately turned over to Agent Foley (T 91, 124).

Agent Hackenberry was also on surveillance at Bryant Park that day. Upon seeing Agent Holmes raise his hands in the distress signal, he also raced to the scene and observed Francisco Garcia running towards the government vehicle (T 110). Francisco Garcia leaned into the government vehicle through the opened door on the driver's side (T 110), exited the vehicle and, looking back over his shoulder, ran towards Agent Hackenberry's vehicle, carrying the black leather pouch (T 111). As Francisco Garcia ran away from the scene, the vehicle Agent Hackenberry was driving and Francisco Garcia collided, resulting in the black pouch dropping out of Francisco Garcia's hand (T 113). After Jose Garcia had been disarmed, Agent Holmes observed that the car door of the government vehicle was open; laying next to the vehicle on the ground was the black pouch containing the "flash roll" of government money (T 46).

Agent Grant's pat-down of Francisco Garcia uncovered the trunk key to the Trans-Am and a $50 counterfeit note, which note was turned over to Agent Foley (T 102, 118). Agent Grant subsequently drove the Trans-Am to the Secret Service Miami

Field Office where a search of the trunk of the vehicle revealed no counterfeit currency (T 103–04).

*The Defense Testimony*

Both appellants testified in their own defense, essentially disputing the government witnesses' testimony as to what had happened and claiming that they had been beaten by the agents. Jose Garcia testified that the confidential Informant Jorge Castro had proposed that they show a few counterfeit bills to a potential purchaser and steal the genuine currency which the man would bring as payment for the counterfeit (T 138, 140–41). Jose Garcia had agreed, and Informant Jorge Castro had given him a $100 counterfeit bill and had given Francisco Garcia a $50 counterfeit bill (T 142). According to Jose Garcia, the plan was simply to take the money. He denied that a pistol was used (T 143). Jose Garcia testified that on July 22, 1981, they had met the agent at Douglas Park and had later moved to Bryant Park (T 145) where there had been an argument about who would show his money first (T 148).

Jose Garcia said that he had never had a gun at the scene. (T 157). Instead, he claimed that Agent Holmes, using the agent's own weapon, had pistol-whipped Jose Garcia on the head (T 148–51). He also testified that Agent Holmes had beaten Ernesto Dominguez to force Dominguez to reveal the location of the counterfeit money (T 148).

Francisco Garcia related essentially the same story as his brother (T 183–200). He testified that Informant Jorge Castro had given him the $50 counterfeit bill (T 180–81). Francisco Garcia said that Ernesto Dominguez had displayed to Agent Holmes the $50 counterfeit and had returned it to Francisco Garcia (T 192). He further testified that the weapon which was introduced into evidence had been in the glove compartment of the Trans-Am (T 182). Although he agreed that a car had hit him, Francisco Garcia denied that he had ever possessed the pouch containing the U.S. Government money (T 193). He also testi-

fied that his brother never had a gun (T 194).

The defense also called Marta Pedrosa, who testified that on July 22, 1981, while standing outside her home, she had seen two cars speeding to the park and stopping near a white Trans-Am (T 228–30). According to Pedrosa, she ran to the park and saw the agents jumping three men and kicking them (T 233). She identified Jose Garcia and Francisco Garcia as two of the men who had been arrested and kicked (T 234). She said she had seen Francisco Garcia fall after being hit by the automobile, but stated that she had not noticed any black pouch in his hand or on the ground (T 238). She identified Agent Foley as having twisted Jose Garcia's arm, demanding to know where the money was (T 239). When the agent had found the key to the Trans-Am, he had gone into the vehicle and had come out holding an automatic pistol (T 241–42). She thought the gun had been removed from the glove compartment.

### Rebuttal by the Government

On July 22, 1981, Edna Benson was in her house, which faces the park. She had noticed the people and heard screaming (T 262). She had gone to the park and saw men being arrested one of whom was strugging to avoid being handcuffed (T 263). The officers were trying to quiet him (T 264). The other young men being handcuffed were quiet. Benson saw no one hit, beat or strike those being arrested (T 265).

### Surrebuttal by Defendants

After the government's rebuttal, the court permitted the defense to reopen its case (T 292–337). The defense called Rafael Pedrosa, father of Maria Pedrosa, as an eyewitness to the events of July 22, 1981.

Pedrosa testified that he saw cars speeding to Bryant Park and walked down to the park to see what had happened (T 341). He saw three young men handcuffed (T 342). One of the agents found a key to the Trans-Am, searched the car, came out of the vehicle with a pistol, removed the clip and placed it in his belt (T 343–45). Pedrosa stated that he did not see anything that had happened in the park before his arrival and that when he arrived at the park the three

men were already handcuffed and one was on the ground hurt (T 358). In addition, he could not tell whether the officer who searched the Trans-Am and exited with a pistol had anything in his hands when he entered the Trans-Am (T 364). He did not see the officers strike any of the men arrested (T 365).

### Sur-surrebuttal by the Government

The government then called Alex Suarez who had also been present in the park on July 22, 1981, when the appellants were arrested. He observed the agent raise his hands, back away and say, "Don't shoot!", although he never saw the gun (T 379, 387). He saw the other agents arrive on the scene and arrest the three men. He did not observe any mistreatment of the three men (T 381). He, too, observed the car being searched. He said the agent who searched the car had a weapon in his waistband before he entered the Trans-Am (T 382).

### No Postal Nexus Required

■ The threshold issue is whether 18 U.S.C. § 2114 requires a "postal nexus" as an essential element. Section 2114 provides, inter alia that "[W]hoever assaults any person having lawful charge, control or custody of any mail matter or of any money or other property of the United States, . . . or robs any such person of mail matter, or any money or other property of the United States" shall be imprisoned.

Appellants contend that section 2114 limits the conduct punishable under its provisions to actions against the Postal Service's property or employees. We do not accept the interpretation urged by appellants. To construe section 2114 as requiring proof of a "postal nexus" defies the section's unambiguous wording that it encompasses the robbery of "mail matter, or any money or other property of the United States." (emphasis added)

■ The specific use of the disjunctive "or" after the comma demonstrates that Congress intended section 2114 to apply not only to robbery of "mail matter" but to money or other property held by an authorized person. The use of a disjunctive in a

statute indicates that alternatives were intended. *United States v. Scrimgeour,* 636 F.2d 1019, 1024 (5th Cir.1981) (Unit B).

If Congress had wanted to limit the offenses prohibited by section 2114 to robbery of mail matter or an assault upon a person holding money or other property in the custody of the United States Post Office, it surely knew how to do so. Congress has repeatedly enacted laws limited to offenses with respect to "mail," "letters" or "packets." *See* Judge Mansfield's dissent in *United States v. Reid,* 517 F.2d 953, 967 (2d Cir.1975).

■ Nor can the appellants resort to the legislative history of section 2114 for support. Review of legislative history is only justified when a statute is inescapably ambiguous. *United States v. Oregon,* 366 U.S. 643, 648, 81 S.Ct. 1278, 1281, 6 L.Ed. 575 (1961); *Schwegmann Bros. v. Calvert Corp.,* 341 U.S. 384, 395–96, 71 S.Ct. 745, 751, 95 L.Ed. 1035 (1951). *See also Malat v. Riddell,* 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966); *Commissioner of Internal Revenue v. Brown,* 380 U.S. 563, 571–72, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (1965).

Assuming arguendo that Section 2114 is ambiguous, the legislative history demonstrates the Congress understood Section 2114 to encompass more than mail matter. *United States v. Reid, supra.* As Judge Mansfield concluded in his dissent:

> " . . . the official reports of both the House and the Senate Committees with respect to the bill disclose that, although the bill was introduced at the request of the Portmaster General and hence referred to the Committee on Post Offices and Post Roads of each House, both Committees understood its purpose to be 'to bring within the provisions of the Penal Code the crime of robbing or attempting to rob custodians of Government moneys.' H.R.Rep. No. 582, 74th Cong., 1st Sess. (1935); Sen.Rep. No. 1440, 74th Cong., 1st Sess. (1935).

*Reid, supra,* at 970.

In addition, a plain language interpretation of section 2114 produces consistency among federal statutes imposing criminal punishment for robbery of a government employee. If section 2114 is interpreted as limited to postal property, the violent attempted robbery of a person in custody of such property would carry a mandatory 25-year sentence, but by contrast, the successful robbery of a person in custody of other government money or property would be punishable by a maximum of 15 years imprisonment under section 2112 or by a maximum of 10 years as an assault under section 111 (if a deadly or dangerous weapon were used). If section 2114 is read according to its plain and unequivocal language, consistency in federal statutes relating to the offense of violent robbery of a government employee is achieved. Thus, under this construction, a violent robbery of a custodian of any government property (whether it be mail matter or other property) draws the same penalty. *See, Reid, supra,* at 970.

We are not unmindful that the Second and Ninth Circuits have held that prosecution under section 2114 for stolen property requires proof of a "postal nexus" as an essential element. *See United States v. Rivera,* 521 F.2d 125 (2d Cir.1975); *United States v. Reid,* 517 F.2d 953 (2d Cir.1975); *United States v. Fernandez,* 497 F.2d 730 (9th Cir.1974). We embrace, however, the well reasoned dissent by Judge Mansfield in *Reid* and we hold that a postal nexus is not an essential element .of a crime charged under section 2114.

### *The Counterfeit Notes Were Properly Admitted into Evidence*

■ Appellants challenge the introduction into evidence of a counterfeit $50 note and a counterfeit $100 note in support of their convictions for knowingly and willfully and with intent to defraud, possessing and concealing forged and counterfeit Federal Reserve Notes (i.e. Count IV). We hold that the evidence at trial met the requirements for authentication and identification as required by Rule 901(a) of the Federal Rules of Evidence.

■ The admission of exhibits into evidence is predicated on a showing that the physical exhibit being offered is in substan-

tially the same condition as when the crime was committed. That determination is to be made by the trial judge, not the jury, and may not be overturned except for a clear abuse of discretion. *Brewer v. United States,* 353 F.2d 260, 262 (8th Cir.1965) *quoting Gallego v. United States,* 276 F.2d 914, 917 (9th Cir.1960). Factors to be considered in making this determination of admissibility include the nature of the article, the circumstances surrounding its preservation and custody, and the likelihood of others tampering with it. "It is generally recognized that tangible objects become admissible in evidence only when proof of their original acquisition and subsequent custody forges their connection with the accused and the criminal offense." *Gass v. United States,* 416 F.2d 767, 770 n. 8 (D.C.Cir.1969). Upon considering such factors, if the trial judge is satisfied that in reasonable probability the article has not been changed in any important respect, he may permit its introduction in evidence. *Brewer v. United States, supra. Brewer* further teaches that in the absence of any evidence to the contrary, the trial judge is entitled to assume that an official would not tamper with the exhibits.

> Where no evidence indicating otherwise is produced, the presumption of regularity supports the official acts of public officers, and courts presume that they have properly discharged their official duties.

*Brewer v. United States, supra,* 353 F.2d at 263, *quoting Gallego v. United States,* 276 F.2d 914, 917 (9th Cir.1960).

Special Agent Foley was in charge of the investigation that led to the indictment of the appellants. Agents Grant and Null also participated in the investigation. Agent Grant testified that he had found the counterfeit $50 bill while patting down Francisco Garcia (T 101–02). Agent Foley identified Government's Exhibit 6 as the counterfeit $50 bill seized from Francisco Garcia by Agent Grant, who immediately turned the note over to Agent Foley (T 118). The bill was admitted into evidence (T 119) and Agent Foley testified as an expert that the note seized from Francisco Garcia was, in fact, counterfeit (T 119–22). Agent Null testified that he had found the counterfeit

$100 bill while patting down Jose Garcia (T 90–91). Agent Foley identified Government's Exhibit 7 as the counterfeit $100 bill seized from Jose Garcia by Agent Null, who immediately turned the note over to Agent Foley (T 122). The $100 counterfeit bill was admitted into evidence (T 123) and Agent Foley testified that the $100 note was, in fact, counterfeit (T 124).

The testimony at trial shows that the government complied with Rule 901(a) of the Federal Rules of Evidence. Through the testimony of the various special agents, the government submitted evidence sufficient to support the trial judge's finding that the counterfeit notes were those possessed by the appellant at the time of their arrests.

The appellants' convictions under Count IV are affirmed.

### The Sufficiency of Evidence

The Garcias challenge the sufficiency of the evidence to support the convictions. More specifically, they argue that (a) the money was neither stolen nor was the owner deprived of its use, (b) Jose Garcia did not brandish a deadly weapon, and (c) they were entrapped. This Court must consider whether, viewing the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942) a reasonable trier of fact could find that the evidence established the appellants' guilt beyond a reasonable doubt. *See United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (Unit B).

■ The Garcias contend that the evidence failed to prove that the money was stolen or purloined or that the owner was deprived of its use as alleged in Count I and II. Appellants focus on the testimony of witnesses as to the black pouch containing the money. Agent Holmes testified that the black pouch was in the Government vehicle and that, after the arrest of Jose Garcia, he observed his car door open and the black pouch containing the flash roll of "government money," on the ground (T 46). Other agents corroborated this testimony and testified to their additional observa-

tions. Agent Hackenberry testified he saw Francisco Garcia leaning into the Government vehicle through the opened door on the driver's side (T 110). He further testified to observing Francisco Garcia exit the vehicle carrying the black pouch, which was dropped when Francisco Garcia and Agent Hackenberry's vehicle collided (T 111). Francisco Garcia disputed this testimony (T 193).

Jose Garcia argues that the evidence was insufficient, because defense witnesses contradicted the Government's version. Agents testified that Jose Garcia, standing in a combat-ready stance, pointed a loaded, chambered semi-automatic weapon at Agent Holmes (T 43–44, 90, 97). Government witness Alex Suarez testified that, although he did not see a gun, he observed Agent Holmes with arms raised and backing away, stating, "Don't shoot" (T 379, 387). The raised arms was a distress signal meaning life in jeopardy (T 44, 88–89, 110). The appellants contradicted this testimony. Both testified that no gun was used and that the weapon was in the glove compartment of the Trans-Am until removed by an agent (T 148, 150, 182). The defense called two witnesses, Marta Pedrosa and her father, Rafael Pedrosa, to support the appellants' allegations. Marta Pedrosa testified that an agent searched the Trans-Am and exited it with the pistol in his hands (T 241–42). After re-opening the defense case, Rafael Pedrosa was called, obviously on the assumption that he would corroborate his daughter's testimony. He did testify to seeing the agent who searched the Trans-Am holding a pistol in his hand after exiting the vehicle (T 343–45). When cross-examined, however, Mr. Pedrosa admitted that he could not tell whether the agent who searched the Trans-Am had anything in his hands when he entered the vehicle to search it (T 364). Further, when Alex Suarez testified as a government witness, he stated that the agent who searched the car had a weapon in his waistband prior to entering the Trans-Am (T 382). The evidence was sufficient to support the appellant's conviction under Counts I and II.

Finally, appellants contend the government failed to show that they possessed a predisposition to commit the offenses. Appellants contend that their testimony at trial supports a defense of entrapment and that their convictions should be reversed because, they argue, the government failed to prove predisposition.

The testimony presented by the government was sufficient to prove predisposition beyond a reasonable doubt. The evidence showed that Jose Garcia and Francisco Garcia both possessed counterfeit bills as show money. The testimony further showed that Jose Garcia refused to conclude the transaction at Douglas Park (T 18) and that the deal was moved to Bryant Park, where Jose Garcia pulled a gun on Agent Holmes (T 43), while Francisco Garcia removed the money from Holmes' vehicle (T 111). The testimony of both appellants contradicted that of the agents and covered facts which, if believed, may have shown inducement. However, that was a jury question. The evidence supports the verdicts.

*The Consecutive Sentences Were Proper*

Jose Garcia was sentenced to a total of forty (40) years incarceration: twenty-five (25) years as to Count III; five (5) years as to Count II; consecutive to Count III; five (5) years as to Counts I and IV, concurrent with each other and concurrent with Count II; and ten (10) years as to Count V, consecutive to Count III (R 26).

Francisco Garcia was sentenced to a total of thirty (30) years incarceration: twenty-five (25) years as to Count III; five (5) years as to Counts I, II and IV, concurrent with each other and consecutive to Count III.

Jose contends that his sentence of forty (40) years is incorrect. He asserts that the correct term is actually thirty-five (35) years based on his contention that Count V (whereby Jose was sentenced to a period of ten (10) years) should run concurrent with the sentences imposed for Counts I, II and IV and not consecutive to them. Jose bases this contention on *Schultz v. United States,* 384 F.2d 374 (5th Cir.1967). In *Schultz,* the Court said:

absent clear language to the contrary, it is presumed that sentences imposed on more than one offense at the same time or at different times, will run concurrently.

*Id.* at 375 *quoting Subas v. Hudspeth,* 122 F.2d 85, 87 (10th Cir.1941). Jose's argument ignores the specific language of the Judgment and Commitment Order which indicates a contrary intent to imposing a concurrent sentence for Count V with Counts I, II and IV. Specifically, the Order states:

As to Count V of the indictment, the defendant is hereby sentenced to ten (10) years in custody of the Attorney General . . . ; this sentence is *to run consecutive to Count III.* Defendant is *sentenced to a total of forty (40) years.*

(R 26, emphasis supplied). The Judgment and Commitment Order also provided for concurrent sentences where they were appropriate as shown by the following:

As to Counts I and IV of the Indictment, . . . ; this sentence is to run concurrently with each other and concurrently with Count II.

(R 26).

It is clear that if the district court had intended for Count V to run concurrently with Counts I, II and IV, it would have included the sentence for Count V in the aforementioned provision and would not have sentenced the appellant to a *total* of forty (40) years incarceration. Accordingly, the Judgment and Commitment Order is correct on its face.

■ The Garcias urge that the consecutive sentence imposed under Counts II, III and V violated their rights against double jeopardy under the Fifth Amendment of the United States Constitution. The guarantee embodied in the Double Jeopardy Clause "has been said to consist of three separate constitutional protections. It protects against a second prosecution for *the same offense* after acquittal. It protects against a second prosecution for *the same offense* after conviction. And it protects against multiple punishments for *the same offense.*" *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d

656 (1969) (emphasis supplied). In determining whether the crimes charged are "the same offense", the inquiry is not whether identical facts support such charges; rather the test to be applied is whether each provision requires proof of a fact which the other does not. *Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981); *Blockburger v. United States,* 284 U.S. 299, 305, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932); *United States v. Lott,* 681 F.2d 1371, 1372 (11th Cir.1982).

■ In the case at bar, section 2114 required proof of the fact that Agent Holmes' "life was put in jeopardy" and also proof of facts showing a "robbery." By contrast, section 111 does not require proof of facts supporting robbery or that Holmes' life was placed in jeopardy. Rather, section 111 requires proof of interference with Holmes while he was "engaged in the performance of his official duties." Thus, the *Blockburger* test is satisfied despite a substantial overlap in the proof adduced to establish the subject crimes. *See Iannelli v. United States,* 420 U.S. 770, at 785 n. 17, 95 S.Ct. 1284, at 1293 n. 17, 43 L.Ed.2d 616 (1975).

Consecutive sentences for convictions under 18 U.S.C. section 111 and section 2112 have been upheld. *United States v. Mathis,* 579 F.2d 415, 418–19 (7th Cir.1978); *United States v. Roundtree,* 527 F.2d 16, 20 (8th Cir.1975). In *Roundtree,* the defendant was charged with robbing a federal law enforcement officer of government money and assaulting the officer. The *Roundtree* Court stated: "The two offenses are separate and distinct, both of which require proof of facts that the other does not." *Id.* at 20. By analogy, convictions under section 111 and section 2114 are also separate and distinct, warranting consecutive sentences.

Under section 2114, the government must also prove that there was a "taking and carrying away by use of *force.*" On the other hand, § 641 (the Count II charge) does not require the wrongful taking be accompanied by force. Clearly, section 2114 requires additional proof of facts not required by section 111 or section 641.

It follows from the above analysis, that separate charges with separate penalty provisions in distinct subchapters of the act are what confronted the trial Court.

 Provided that the Court does not exceed the legislative authorization by imposing multiple punishment for the same offense, following a single trial, the Constitutional guarantee against double jeopardy is not violated. *Missouri v. Hunter,* —— U.S. ——, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983). A legislature can specifically authorize cumulative punishment under two statutes which proscribe the "same" conduct. *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). Accordingly, the trial court may impose cumulative punishment under such statutes at a single trial. *Missouri v. Hunter, supra.* In addition, although the legislative history is silent on the question of whether consecutive sentences can be imposed for violations of sections 2114 and 111, it can "be assumed . . . Congress was aware of the *Blockburger* rule and legislated with it in mind." *Albernaz v. United States, supra,* 101 S.Ct. at 1143–44.

 Jose also contends that the elements necessary to prove the violations charged in Counts II and V are the same as those in Count III, and are therefore "lesser included offenses" of Count III, requiring merger for the purpose of sentencing. When some, but not all, of the elements of the crime charged would support a conviction of another offense, the latter may be termed a "lesser offense." *Berra v. United States,* 351 U.S. 131, 134, 76 S.Ct. 685, 687, 100 L.Ed. 1013 (1956); *United States v. Crutchfield,* 547 F.2d 496, 500 (9th Cir.1977). The lesser offense must not require some additional element not needed to constitute the greater offense. *Olais-Castro v. United States,* 416 F.2d 1155, 1157 (9th Cir.1969).

 Count V (section 111 violation) requires proof of "forcibly assaulting, resisting, opposing, impeding and interfering" with a Secret Service agent. Count III (section 2114 violation) requires proof of "putting the life of an agent in jeopardy." This element would not necessarily support a conviction for the above provision of Count V. Thus, proof that an agent's life is put in jeopardy" does not *ipso facto* prove that the defendant "forcibly assaulted, resisted, opposed, impeded and interfered" with the agent's official duties. Likewise, if the government established the element of robbery as required in section 2114 (Count III), this does not necessarily prove the element of "forcibly assaulting, resisting, opposing, impeding and interfering" with an agent in the performance of his official duties as Count V would require. Accordingly, Count V is not a lesser included offense of Count III and therefore consecutive sentences are permissible.

Appellants argue that "stealing and purloining money of the United States," in violation of section 641, is a lesser included offense of section 2114 because "the elements of section 641 must necessarily be proven to convict a defendant of section 2114." They were convicted under Count III for "knowingly and wilfully robbing $1,800 in money belonging to the United States from Secret Service Agent Holmes" and in that robbery, putting the life of Agent Holmes in jeopardy by use of a dangerous weapon. On this basis, they urge that the offenses under Counts II and III require a merger for the purpose of sentencing.

The element of force, which is necessary to prove robbery, *Brown v. State of Alabama,* 619 F.2d 376 (5th Cir.1980), is not part of the offense of "stealing and purloining." The element of stealth is usually attributed to the latter, the antithesis of force or violence. *Crabb v. Zerbst,* 99 F.2d 562, 564 (5th Cir.1938). In *Crabb,* the court held that the statutory offense of "feloniously taking and carrying away" personalty belonging to the United States (robbery), is not identical with the offense of "stealing" property of the United States and ". . . the penalty provisions of the one (are not) . . . affected by the other." *Id.* at 565.

The facts of this case support the position that section 2114 and section 641 are not greater and lesser offenses. *See Crabb v. Zerbst, Id.*

The convictions are AFFIRMED as to all Counts.**

** However, although Francisco was not convicted of the Count V (assault) violation, and Jose was convicted of all counts, the Judgment and Conviction read identically as to both defendants. This cause is REMANDED for entry of a corrected Judgment and Commitment for Francisco.