# GARCIA ET AL. *v.* UNITED STATES

No. 83–6061.   Argued October 10, 1984—Decided December 10, 1984

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, and O'CONNOR, JJ., joined.

STEVENS, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 80.

*Charles G. White* argued the cause *pro hac vice* for petitioners. With him on the briefs was *Theodore J. Sakowitz.*

*Jerrold J. Ganzfried* argued the cause for the United States. With him on the brief were *Solicitor General Lee, Assistant Attorney General Trott, Deputy Solicitor General Frey,* and *John F. De Pue.*

JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioners assaulted an undercover United States Secret Service agent with a loaded pistol, in an attempt to rob him of $1,800 of Government "flash money" that the agent was using to buy counterfeit currency from them. They were convicted of violating 18 U. S. C. § 2114, which proscribes the assault and robbery of any custodian of "mail matter or of any money or other property of the United States." The United States Court of Appeals for the Eleventh Circuit affirmed petitioners' convictions, over their contention that § 2114 is limited to crimes involving the Postal Service. 718 F. 2d 1528 (1983). We granted certiorari, 466 U. S. 926 (1984), to resolve a split in the Circuits concerning the reach of § 2114,[1] and we affirm.

Agent K. David Holmes of the United States Secret Service posed as someone interested in purchasing counterfeit currency. He met petitioners Jose and Francisco Garcia in a park in Miami, Fla. Petitioners agreed to sell Holmes a large quantity of counterfeit currency, and asked that he show them the genuine currency he intended to give in exchange. He "flashed" the $1,800 of money to which he had been entrusted by the United States, and they showed him a sample of their wares—a counterfeit $50 bill.

---

[1] See *United States* v. *Reid,* 517 F. 2d 953 (CA2 1975); *United States* v. *Rivera,* 513 F. 2d 519 (CA2), cert. denied, 423 U. S. 948 (1975); *United States* v. *Fernandez,* 497 F. 2d 730 (CA9 1974), cert. denied, 420 U. S. 990 (1975).

Wrangling over the terms of the agreement began, and Jose Garcia leapt in front of Holmes brandishing a semi-automatic pistol. He pointed the pistol at Holmes, assumed a combat stance, chambered a round into the pistol, and demanded the money. While Holmes slowly raised his hands over his head, three Secret Service agents who had been watching from afar raced to the scene on foot. Jose Garcia dropped the pistol and surrendered, but Francisco Garcia seized the money belonging to the United States and fled. The agents arrested Jose Garcia on the spot, and pursued and later arrested Francisco Garcia as well.

Petitioners were convicted in a jury trial of violating 18 U. S. C. § 2114 by assaulting a lawful custodian of Government money, Agent Holmes, with intent to "rob, steal, or purloin" the money. That section states in full:

> "Whoever assaults any person having lawful charge, control, or custody of any mail matter or of any money or other property of the United States, with intent to rob, steal, or purloin such mail matter, money, or other property of the United States, or robs any such person of mail matter, or of any money, or other property of the United States, shall for the first offense, be imprisoned not more than ten years; and if in effecting or attempting to effect such robbery he wounds the person having custody of such mail, money, or other property of the United States, or puts his life in jeopardy by the use of a dangerous weapon, or for a subsequent offense, shall be imprisoned twenty-five years."

Both petitioners were sentenced to the 25-year prison term mandated by § 2114 when the assault puts the custodian's life in jeopardy by use of a dangerous weapon.[2] On appeal the Court of Appeals for the Eleventh Circuit affirmed the judgments of conviction. The only issue before us on certiorari is whether the language "any money, or other property of the

---

[2] Petitioners were also convicted of other crimes. See 718 F. 2d 1528 (1983).

United States" in § 2114 includes the $1,800 belonging to the United States and entrusted to Agent Holmes as "flash money" in this case.

Section 2114 prohibits the assault with intent to rob of "any person having lawful charge, control or custody of any mail matter *or of any money or other property of the United States . . . .*" (emphasis supplied). Petitioners contend that notwithstanding the reach of this language, Congress intended that only the robbery of "postal" money or property was to be covered by the statute.

The enacted language of the statute is contrary to petitioners' argument. The language protects custodians of any mail matter, custodians of any United States money, and, in a catchall phrase, custodians of any other United States property. As in our recent case of *Lewis* v. *United States*, 445 U. S. 55 (1980), "[n]othing on the face of the statute suggests a congressional intent to limit its coverage to persons [employed by the Postal Service]." *Id.*, at 60.

The three classes of property protected by § 2114 are each separated by the conjunction "or." Canons of construction indicate that terms connected in the disjunctive in this manner be given separate meanings. See *FCC* v. *Pacifica Foundation*, 438 U. S. 726, 739–740 (1978). In *Reiter* v. *Sonotone Corp.*, 442 U. S. 330 (1979), we refused to ignore the statutory meaning which would be presumed from similar disjunctive language, stating that the use of the term "or" indicates an intent to give the nouns their separate, normal meanings. *Id.*, at 339. In our case, Congress separated "mail matter," "money," and "other property" from one another by use of a disjunctive, and we think this means that the word "money" must be given its ordinary, separate meaning; it does not mean "postal money" or "money in the custody of postal employees."

Petitioners contend that the language of the statute is ambiguous, and in support of this contention offer what seems to us a rather labyrinthine explanation of the statutory language. Petitioners first claim that the conjunction "or"

cannot properly be read to totally separate the three types of property listed in the prohibition; for if the word "or" indeed strictly separates the three types of property, the statute would proscribe assaults on custodians of any "money," whether or not it was money belonging to the United States, because the term "money" would not be modified or restricted by the term "of the United States" which follows the word "property." Thus Congress would have enacted a law, say petitioners, proscribing assaults on custodians of money by whomever owned, and "Congress would then have enacted a Federal robbery statute without any jurisdictional basis." Reply Brief for Petitioners 3. Because Congress could not have intended this absurd result, petitioners contend, there is an ambiguity in the statutory language. This contention, however, totally ignores the word "other" which follows "money" and shows that the money referred to, like the property referred to, is money belonging to the United States.

Petitioners then develop their argument by invoking the principle of *ejusdem generis* to resolve the ambiguity which their analysis creates. Under that principle, of course, where general words follow an enumeration of specific terms, the general words are read to apply only to other items like those specifically enumerated. See *Harrison* v. *PPG Industries, Inc.*, 446 U. S. 578, 588 (1980). Petitioners thus urge that "mail matter" is a specific term, and therefore the general terms "money" and "other property" which follow it must be read in the specific, restricted postal context. They conclude that "money" was intended to mean "postal money" and "other property of the United States" was intended to mean "other postal property."

We said in *Harrison* that " " "the rule of *ejusdem generis*, while firmly established, is only an instrumentality for ascertaining the correct meaning of words when there is uncertainty." " " *Ibid.*, quoting *United States* v. *Powell*, 423 U. S. 87, 91 (1975), in turn quoting *Gooch* v. *United States*,

297 U. S. 124, 128 (1936). We are not persuaded that petitioners' analysis of the statutory language creates any ambiguity in the plain meaning of the words, and even if it did we do not think that the particular language here lends itself to the application of the *ejusdem generis* rule. We have previously noted that the terms in question are made separate and distinct from one another by Congress' use of the disjunctive; in addition, the term "mail matter" is no more specific a term—and is probably less specific—than "money."

Notwithstanding petitioners' argument to the contrary, we are satisfied that the statutory language with which we deal has a plain and unambiguous meaning. While we now turn to the legislative history as an additional tool of analysis, we do so with the recognition that only the most extraordinary showing of contrary intentions from those data would justify a limitation on the "plain meaning" of the statutory language. When we find the terms of a statute unambiguous, judicial inquiry is complete, except in "'rare and exceptional circumstances,'" *TVA* v. *Hill*, 437 U. S. 153, 187, n. 33 (1978), quoting *Crooks* v. *Harrelson*, 282 U. S. 55, 60 (1930).

Section 2114 had its genesis as a law to protect mail carriers from assault and robbery of mail matter. The forerunner to § 2114 was 18 U. S. C. § 320 (1934 ed., Supp. V). It proscribed assault and robbery of "any person having lawful charge, control, or custody of any mail matter." Section 320 had been placed in Chapter 8 of Title 18 of the United States Code. Chapter 8 was entitled "Offenses Against Postal Service." In 1935, however, the 74th Congress amended § 320 by appending after the term "mail matter" the clause "or of any money or other property of the United States." Section 320 as amended retained its place in Chapter 8 of Title 18 until 1948, when it was transferred to Chapter 103, which is entitled "Robbery and Burglary" and contains all of the federal statutes covering those crimes. Act of June 25, 1948, ch. 645, 62 Stat. 797. Section 320 was then renumbered as § 2114; with the exception of minor par-

ticulars the text of the statute has remained unchanged since the 1935 amendment.

Petitioners contend that the 1935 amendment to § 320 was not intended to expand the reach of that statute beyond postal crimes. In support of this they rely on some short colloquies from the House floor which they describe as "snippets."

In surveying legislative history we have repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which "represen[t] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation." *Zuber* v. *Allen,* 396 U. S. 168, 186 (1969). We have eschewed reliance on the passing comments of one Member, *Weinberger* v. *Rossi,* 456 U. S. 25, 35 (1982), and casual statements from the floor debates. *United States* v. *O'Brien,* 391 U. S. 367, 385 (1968); *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.,* 447 U. S. 102, 108 (1980). In *O'Brien, supra,* at 385, we stated that Committee Reports are "more authoritative" than comments from the floor, and we expressed a similar preference in *Zuber, supra,* at 187.[3]

The Committee Reports on this bill show no intent on the part of the 74th Congress to limit the amended § 320 to less than the normal reach of its words. The House Report on the bill to amend § 320 is entitled "SAFEGUARDING CUSTODIANS OF GOVERNMENT MONEYS AND PROPERTY" and states that "[t]he purpose of the pending

---

[3] As Justice Jackson stated:

"Resort to legislative history is only justified where the face of the Act is inescapably ambiguous, and then I think we should not go beyond Committee reports, which presumably are well considered and carefully prepared. . . . [T]o select casual statements from floor debates, not always distinguished for candor or accuracy, as a basis for making up our minds what law Congress intended to enact is to substitute ourselves for the Congress in one of its important functions." *Schwegmann Bros.* v. *Calvert Distillers Corp.,* 341 U. S. 384, 395–396 (1951) (concurring).

bill is to bring within the provisions of the Penal Code the crime of robbing or attempting to rob custodians of Government moneys." H. R. Rep. No. 582, 74th Cong., 1st Sess., 1 (1935). The Senate Report on the 1935 amendment is entitled "PROVIDING FOR PUNISHMENT FOR THE CRIME OF ROBBING OR ATTEMPTING TO ROB CUSTODIANS OF GOVERNMENT MONEYS OR PROPERTY," and the Senate Report states the purpose of the bill exactly like the House Report. S. Rep. No. 1440, 74th Cong., 1st Sess., 1 (1935). Nowhere do the Committee Reports state that the amended statute required a "postal nexus" or was limited to postal crimes.

Petitioners make a good deal of the fact that both Reports contain the letter from the Postmaster General, requesting enactment of the bill. That official's letter, however, says nothing about limiting the broad language of the bill to postal crimes, but instead speaks simply of "custodian[s] of Government funds," not of Government "mail." H. R. Rep. No. 582, *supra*, at 1; S. Rep. No. 1440, *supra*, at 1. In two places the Postmaster General's letter states that the bill was designed to punish the crime of "robbing or attempting to rob custodians of Government moneys." *Ibid.* Thus the Committee Reports show that the Postmaster, and the two Committees responsible for the legislation, gave no evidence of their belief that the statute was limited to postal crimes.

Petitioners rely heavily on the statement of Representative Dobbins, whom the dissent identifies as the floor manager, made on the floor of the House of Representatives on May 24, 1935. Representative Dobbins stated:

> "The only purpose of the pending bill is to extend the protection of the present law to property of the United States in the custody of its postal officials. . . . [L]et me say there are many custodians of postal stations who have a great amount of money in their custody but little mail. . . ." 79 Cong. Rec. 8205 (1935).

We find a number of flaws in petitioners' argument that Representative Dobbins' statement is clear proof of Congress' intent. First, this snippet quotes Representative Dobbins out of context. The above-quoted statement was made in response to an objection from another Member concerning the mandatory 25-year penalty in the proposed statute. As one in favor of the bill, Representative Dobbins' attempt to limit the scope of the statute is best read in light of this objection. See *ibid.* To permit such colloquies to alter the clear language of the statute undermines the intent of Congress. *Regan* v. *Wald,* 468 U. S. 222, 237 (1984). See *Russello* v. *United States,* 464 U. S. 16 (1983). Isolated statements such as Representative Dobbins' are "not impressive legislative history." *Zuber, supra,* at 187. If they were, a statement of Representative Wolcott earlier in the same colloquy to the effect that "[t]his bill is confined to assaults on Federal law-enforcement officers," 79 Cong. Rec., at 8205, would seem to counterbalance the import of Representative Dobbins' statement. Thus petitioners would lose even if we were to adopt some type of reverse parol evidence rule, where oral statements were elevated above enacted language in determining the meaning of the statute.

We think probably the strongest argument that may be made for limitation on the coverage of § 2114, although petitioners do not themselves make it as such, is that set forth in the opinion of the Court of Appeals for the Second Circuit in *United States* v. *Reid,* 517 F. 2d 953 (1975), and amplified by our dissenting colleagues today. This argument is certainly not without persuasive power, and it would perhaps be controlling if there were substantial ambiguity in the language Congress had enacted. But there is no such ambiguity. We are not willing to narrow the plain meaning of even a criminal statute on the basis of a gestalt judgment as to what Congress probably intended.

As a final argument petitioners assert that they are vindicated by the Solicitor General's earlier stipulation in *United*

*States* v. *Hanahan*, 442 F. 2d 649 (CA7 1971), vacated and remanded, 414 U. S. 807 (1973). In that case we were faced with the identical issue presented here, but we vacated and remanded in light of the Solicitor General's concession that § 2114 only applied to postal crimes.[4] The Solicitor General now states that his concession in *Hanahan* was unwarranted. As we noted in *NLRB* v. *Iron Workers*, 434 U. S. 335, 351 (1978), a governmental agency "is not disqualified from changing its mind" concerning the construction of a statute. See also *Barrett* v. *United States*, 423 U. S. 212, 222 (1976). Moreover, private agreements between litigants, especially those disowned, cannot relieve this Court of performance of its judicial function. It is our responsibility to interpret the intent of Congress in enacting § 2114, irrespective of petitioners' or respondent's prior or present views. "[T]he proper administration of the criminal law cannot be left merely to the stipulation of [the] parties." *Young* v. *United States*, 315 U. S. 257, 259 (1942). We agree that the Solicitor General's prior concession was ill-advised, but it does not control this case.

Petitioners seek to clip § 2114 despite its plain terms, but "[t]he short answer is that Congress did not write the statute that way." *Russello*, 464 U. S., at 23.[5] Instead, Con-

---

[4] Despite the Solicitor General's view, Government prosecutors had relied on § 2114 outside of the postal context. See, *e. g., United States* v. *O'Neil*, 436 F. 2d 571 (CA9 1970) (Customs Service employee); *United States* v. *Sherman*, 421 F. 2d 198 (CA4) (military money custodian), cert. denied, 398 U. S. 914 (1970); *Peek* v. *United States*, 321 F. 2d 934 (CA9 1963) (same).

[5] We disagree with petitioners' assertion that § 2114 as we have read it does not fit well with other federal statutes, especially § 2112. The statutes are related but not duplicitous. Section 2112 prohibits only consummated robberies of any person—whether lawful custodian or not—possessing any type of personal property of the United States. The difference between § 2112 and § 2114 is that the latter is specifically directed to authorized custodians, and protects them against assaults accompanying both attempted and completed robberies. Thus the statutes complement each other.

gress selected language that penalized assaults or robberies of anyone who is a custodian of "any money or other property of the United States." It is beyond question that by using a pistol in an effort to rob Agent Holmes, petitioners fell squarely within the prohibitions of the statute.

The judgment of the Court of Appeals is therefore affirmed.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

When the literal application of a statute would produce a result "demonstrably at odds with the intentions of its drafters," the actual legislative intent must control our disposition. See *Griffin* v. *Oceanic Contractors, Inc.*, 458 U. S. 564, 571 (1982). I believe a similar rule should apply to the literal application of a federal criminal statute that is dramatically broader than the coverage that its draftsmen intended.

I

A fair reading of the entire history of 18 U. S. C. § 2114 convinces me that Congress never intended it to apply outside of the postal context. As the Court correctly notes, *ante*, at 75, § 2114 "had its genesis as a law to protect mail carriers from assault and robbery of mail matter." The deterrent purpose of such a law justifies the imposition of especially severe sanctions. For that reason, heavy penalties have always been authorized, and sometimes mandated, for assaults upon mail carriers.

The Second Congress, recognizing the importance of the delivery of the mails, enacted the earliest predecessor to § 2114 in 1792. That enactment, entitled "An Act to establish the Post-Office and Post Roads within the United States,"[1] stated in part that death was the penalty for any

---

[1] Act of Feb. 20, 1792, ch. 7, § 1, 1 Stat. 232.

person who robbed "any carrier of the mail of the United States."[2]   The penalty for robbery of a carrier of the mail remained the same when the Third Congress passed the Act of May 8, 1794.[3]   Almost three years later, Congress made aiding and abetting the robbery of a mail carrier an offense also subject to a penalty of death.[4]

Repeatedly in subsequent years Congress enacted special legislation dealing with mail-robbery offenses.   Such statutes were enacted in 1799,[5] 1810,[6] 1825,[7] 1872,[8] and

---

[2] That section provided in pertinent part:

"That if any person or persons shall rob any carrier of the mail of the United States, of such mail, or if any person shall rob the mail, in which letters are sent to be conveyed by post, of any letter or packet, or shall steal such mail, or shall steal and take from or out of the same, or from or out of any post-office, any letter or packet, such offender or offenders shall, on conviction thereof, suffer death."   § 17, 1 Stat. 237.

[3] See ch. 23, § 17, 1 Stat. 361.

[4] Act of Mar. 3, 1797, ch. 19, § 4, 1 Stat. 511.

[5] Act of Mar. 2, 1799, ch. 43, § 15, 1 Stat. 736–737 (up to 40 lashes and imprisonment not exceeding 10 years for first mail-robbery conviction; death for first mail-robbery conviction, if wounding the carrier or placing his life in danger by the use of a dangerous weapon; death for second mail-robbery conviction; up to 30 lashes or imprisonment not exceeding two years, or both, for attempted robbery of the mails).

[6] Act of Apr. 30, 1810, ch. 37, § 19, 2 Stat. 598 (up to three years' imprisonment for attempted robbery of the mails by assaulting, shooting, or threatening the custodian with a dangerous weapon).

[7] Act of Mar. 3, 1825, ch. 64, § 22, 4 Stat. 108–109 (5 to 10 years' imprisonment for first mail-robbery conviction; death for first mail-robbery conviction if the carrier of the mails was wounded or had his life put in danger by a dangerous weapon; death for second mail-robbery conviction).

[8] In 1872, Congress passed *"An Act to revise, consolidate, and amend the Statutes relating to the Post-office Department."*   Act of June 8, 1872, ch. 335, §§ 1–327, 17 Stat. 283–330.   Section 285 of the revision stated:

"That any person who shall rob any carrier, agent, or other person intrusted with the mail, of such mail, or any part thereof, shall, on conviction thereof, be imprisoned at hard labor not less than five nor more than ten years; and if convicted a second time of a like offence, or if, in effecting such robbery the first time, the robber shall wound the person having custody of the mail, or put his life in jeopardy by the use of dangerous weapons, such

1909.[9]   In the 1909 statute, Congress established a mandatory minimum sentence of incarceration of 25 years for attempted robbery if the mail carrier was wounded or had his life put in danger.   As it had done consistently for over a century, Congress thus ensured that the law would provide special protection for a person within the postal setting by making it clear that a crime upon such a person was an unusually serious matter, not only because it was a federal offense, but also because of the severity of the mandated penalty.[10]

---

offender shall be imprisoned at hard labor for the term of his natural life." 17 Stat. 320.

In contrast to the single grouping of offenses related to mail robbery in previous statutes, the revision also contained a separate section for attempting to rob a mail carrier:

"That any person who shall attempt to rob the mail by assaulting the person having custody thereof, shooting at him or his horse, or threatening him with dangerous weapons, and shall not effect such robbery, shall, on conviction thereof, be imprisoned at hard labor not less than two nor more than ten years."   § 287, 17 Stat. 320.

The Revised Statutes of 1878 contained the separate mail-robbery-related provisions, as renumbered.   Rev. Stat. §§ 5472, 5473.

[9] In 1909 Congress codified the United States Penal Code, combined the two sections that related to robbery of the mails, and placed the single statute on mail robbery in the section entitled "Offenses Against Postal Service."   Act of Mar. 4, 1909, ch. 321, § 197, 35 Stat. 1126.   The section provided:

"Whoever shall assault any person having lawful charge, control, or custody of any mail matter, with intent to rob, steal, or purloin such mail matter or any part thereof, or shall rob any such person of such mail or any part thereof, shall, for a first offense, be imprisoned not more than ten years; and if in effecting or attempting to effect such robbery, he shall wound the person having custody of the mail, or put his life in jeopardy by the use of a dangerous weapon, or for a subsequent offense, shall be imprisoned for twenty-five years."   *Ibid.*

See 18 U. S. C. § 320 (1934 ed., Supp. V).

[10] Congress' attention was particularly called to the consolidation of the previous two sections and the establishment of a single 25-year penalty. The Report on S. 2982, 60th Cong., 1st Sess., stated:

The history through the 1909 codification and in the immediate years thereafter unequivocally demonstrates that § 2114's predecessors were always intended for postal offenses. This case, of course, involves an interpretation of the amendment of § 320 of Title 18 that Congress adopted in 1935. The question is whether Congress intended to abandon the postal nexus that had characterized this legislation throughout its long history.

## II

A review of the circumstances leading to the 1935 amendment persuades me that Congress merely intended to broaden the protection of postal workers. In 1934 two bills containing the amendatory language that was enacted in the following year were introduced in the House of Representatives and referred to the Committee on the Judiciary.[11] Neither of those bills was reported out of that Committee which, of course, is the Committee that would normally process a significant change in the general coverage of the Criminal Code. In 1935, the highest postal official, the Postmaster General, wrote a letter to Representative James M. Mead, Chairman of the House Committee on the Post Office and Post Roads, requesting an amendment to cover assaults

---

"This section is made up of two sections of the Revised Statutes. Under those sections, one committing robbery of the mails, or attempting to do so, and in doing or attempting to do which makes use of a dangerous weapon, is subject to imprisonment for life. This language has been omitted and the maximum imprisonment which may be imposed has been reduced to twenty-five years." S. Rep. No. 10, 60th Cong., 1st Sess., 21 (1908) (Report of the Special Joint Committee on the Revision of the Laws).

Throughout the discussion on the provision, Congress had no doubt that it was concerned with the mails. *Id.*, at 1906 ("The offense intended to be reached by this provision is interfering with a person having custody of the mail") (statement of Mr. Heyburn).

[11] See H. R. Rep. No. 582, 74th Cong., 1st Sess., 1–2 (1935).

on custodians of Government funds.[12]   In both the House and the Senate it was the Committee on the Post Office and Post Roads that processed the requested legislation.   See H. R. Rep. No. 582, 74th Cong., 1st Sess. (1935); S. Rep. No. 1440, 74th Cong., 1st Sess. (1935).

The 1935 amendment that was referred to the House Committee on the Post Office and Post Roads was a non-controversial measure that Congressman Dobbins, a Member of that Committee, managed on the floor of the House.   In response to a query, he stated that "[t]he only purpose of

---

[12] The text of the letter stated:

"The receipt is acknowledged of your letter of the 16th instant, requesting a report on H. R. 5360, a bill providing for punishment for the crime of robbing or attempting to rob custodians of Governnment moneys or property.

"Assaults upon custodians of mail matter are punishable under section 197 of the Federal Penal Code (18 U. S. C. 320), which provides a penalty of 25 years' imprisonment if the custodian is wounded or his life is put in jeopardy by the use of a dangerous weapon.   If the person assaulted is a custodian of Government funds (not mail) the maximum punishment that can be imposed is imprisonment for not more than 10 years and a fine of not more than $5,000; and no penalty is provided for attempts to commit such crimes.   Recent years have witnessed a substantial increase in crimes of the latter type and it is believed that section 197 of the Penal Code should be amended so as to bring within its provisions the crime of robbing or attempting to rob custodians of Government moneys.   Legislation to this effect was recommended in the Postmaster General's annual report for 1933 and two bills, H. R. 6546 and H. R. 7214, were introduced and referred to the House Judiciary Committee but neither bill was reported out by the committee.   The recommendation for the passage of this legislation is renewed."   H. R. Rep. No. 582, 74th Cong., 1st Sess., 1–2 (1935).

See also Hearings before Subcommittee No. 8 of the House Committee on the Post Office and Post Roads on H. R. 154, 3252, 5049, 5162, 5360, 5370, 74th Cong., 1st Sess., 24 (1935) ("What we want to say about this bill is the fact that when a bandit, at the point of a gun, holds up our postal employees and takes mail, we have a 25-year penalty for it, but if he comes into the post office and does the same thing and takes away only cash, we are unable to give him such a sentence") (statement of K. P. Aldrich, Chief Post Office Inspector).

the pending bill is to extend the protection of the present law to property of the United States *in the custody of its postal officials*, the same as it now extends that protection to mail matter in the custody of its postal officials." [18]    When a

---

[18] 79 Cong. Rec. 8205 (1935) (emphasis added).    The discussion that led to the comment proceeded, in part, as follows:

"Mr. DOBBINS. I do not believe that the recommittal of this bill would accomplish anything.    It was rather thoroughly considered.    It did not merely receive perfunctory consideration.    I think the language to which objection was made the previous day when this bill was considered, while it may be unusual language, it has been in the statute a great many years. Since the objection was made the other day I have taken up the matter with the legal advisor and with the inspection force of the Post Office Department.    They feel it would be extremely dangerous to change the language of the statute as it is now.    As to new language being incorporated in the act, I see no objection to changing it in the manner suggested by the gentleman from Michigan [Mr. Wolcott] at the last hearing of the Consent Calendar.

"Mr. WOLCOTT. I stated at that time that I thought it was a very poorly drafted bill, and I had hoped the committee would redraft it and report it out.    I do not insist upon my amendment so far as the penalty is concerned.    I think it is a very bad way to leave legislation, making it mandatory upon a judge to give a particular sentence, and no more or no less.    If the committee want it that way, however, I have no objection.    I think, however, for the purpose of safeguarding the integrity of our work here the language on page 1 should be amended.

.          .          .          .          .

"Mr. DOBBINS. Mr. Speaker, the gentleman from Ohio objects to the 25-year penalty provision provided in this bill.    The penalty clause is not new legislation.    If this bill is not passed, the statute will still contain the mandatory 25-year penalty.

"The only purpose of the pending bill is to extend the protection of the present law to property of the United States in the custody of its postal officials, the same as it now extends that protection to mail matter in the custody of postal officials.    Aside from that it makes no change in the law. It just includes property of the United States in addition to mail matter which is protected; and let me say there are many custodians of postal stations who have a great amount of money in their custody but little mail; for instance in those substations where money orders are sold.    If a bandit attacks those employees seeking that money, there is no way to prosecute

relatively minor piece of legislation of this sort is processed with almost no debate on the floor of either House, the unambiguous comment of a spokesman for the Committee that reported the bill is particularly illuminating.   In my opinion it is entitled to greater weight than a general statement in the Committee Reports that is little more than a paraphrase of the statutory language itself.

As Judge Friendly succinctly wrote in *United States* v. *Reid*, 517 F. 2d 953 (CA2 1975):

> "[T]he 1935 amendment was to a statute which stood in the chapter of the Criminal Code dealing with offenses against the postal service.   No Congressman could have supposed that, in passing an amendment to that section proposed by the Postmaster General and recommended by the committees dealing with the postal service, he was creating a new crime with respect to government property generally." *Id.*, at 957, n. 3a.

### III

Even after Congress enacted the 1935 amendment, thus structuring the statute to read [14] in much the same form as it

---

the bandit under the present law, but if he is merely after a postal card or a letter he can be prosecuted.

"I think this makes a salutory change in the law.   It is advocated by the Post Office Department and it seems to me there ought to be no objection to it." *Ibid.*

[14] The text of the statute read:

"Whoever shall assault any person having lawful charge, control, or custody of any mail matter or of any money or other property of the United States, with intent to rob, steal, or purloin such mail matter, money, or other property of the United States, or any part thereof, or shall rob any such person of such mail matter, or of any money, or other property of the United States, or any part thereof, shall, for the first offense, be imprisoned not more than ten years; and if in effecting or attempting to effect such robbery he shall wound the person having custody of such mail, money, or other property of the United States, or put his life in jeopardy by the use of a dangerous weapon, or for a subsequent offense, shall be

exists today, the statute remained in the chapter dealing with crimes against the Postal Service until the general revision of the Judicial Code in 1948. No one contends that the 1948 revision changed the meaning of the statute.[15]

Apparently it never occurred to any federal prosecutor that this statute had any application outside the postal context until several decades after it was amended.[16] Indeed, in 1973, when the question was first considered at the top executive level of the Department of Justice in *United States* v. *Hanahan*, 442 F. 2d 649 (CA7 1971), vacated and remanded, 414 U. S. 807 (1973), Solicitor General Bork carefully examined the question, concluding that it covered only postal crimes. The Solicitor General's explanation of that conclusion merits quotation:

> "In 1935 Congress added the more encompassing phrase 'money or other property of the United States.' On its face the statute covers the crime for which petitioner was convicted, as one involving a 'person having lawful charge, control, or custody of any . . . money or other property of the United States . . . . We agree with petitioner, however, that the legislative history plainly shows that the statute was intended to apply only to postal crimes.
>
> "The bill amending the statute was designed to remedy the anomalous situation which existed under the old statute. Before the amendments the statute imposed a severe penalty on one who robbed mail matter from the Postal Office but imposed no penalty on one who

imprisoned twenty-five years." Act of Aug. 26, 1935, ch. 694, 49 Stat. 867.

[15] The Court, *ante*, at 75–76, correctly states that § 320 was renumbered § 2114 and transferred to the section of Title 18 entitled "Robbery and Burglary" in 1948. Act of June 25, 1948, ch. 645, 62 Stat. 797.

[16] The earliest appeal using § 2114 outside of a postal setting appears to be *Peek* v. *United States*, 321 F. 2d 934 (CA9 1963); it arose almost three decades after the 1935 amendment.

robbed money or other valuable property from the Post Office. . . .

"The change in the law had been advocated by the Post Office Department and only that Department submitted a report on the bill to the House and Senate Committees on Post Office and Post Roads. . . . We therefore concede that Section 2114, as amended, was designed only to cover robberies of post offices or postal employees."[17]

## IV

Even if I am correct in my appraisal of the actual intent of Congress, it is arguable that the statutory language is sufficiently plain that it should nevertheless be given effect. There are, however, three special concerns that lead me to the contrary conclusion.

First is the relationship between this statute and other parts of the Criminal Code. The general statute proscribing thefts of Government property, 18 U. S. C. § 2112, carries a lesser penalty even if violence accompanies the theft.[18] The more severe penalty in § 2114 is only explicable if we assume that Congress wanted to provide a special deterrent to crimes against an identifiable class of federal employees. Moreover, that special deterrent is consistent with the congressional decision in 1868 that mail carriers should wear special uniforms that the Postmaster General prescribed. See Act of July 27, 1868, ch. 246, § 20, 15 Stat. 197. Robbery of a uniformed postal worker fits squarely into the rationale for § 2114. The assault in this case, however, was upon an undercover agent not known to have any connection with

---

[17] Memorandum for United States in *Hanahan* v. *United States*, O. T. 1972, No. 72–6454, pp. 2–3 (footnotes omitted).

[18] That section provides:

"Whoever robs another of any kind or description of personal property belonging to the United States, shall be imprisoned not more than fifteen years."

the Federal Government. This type of robbery is not appropriately prosecuted under § 2114.[19]

Second, the severity of the mandatory minimum sentences—10 years if no actual or threatened violence is involved and 25 years in a case of this kind—is rather plainly disproportionate to the offense if it covers every conceivable theft of Government property—even the attempted robbery of a Government-owned hammer.[20] The Government responds by noting that it is for Congress to decide if a penalty is too harsh.[21] This is quite true. But this response identifies my final—and most important—concern.

It is Congress, rather than the Executive, that must define the dimensions of the federal law enforcement program. Law enforcement remains, and should remain, the primary responsibility of the several States. Every increase in the power of the federal prosecutor moves us a step closer to a national police force with its attendant threats to individual liberty. For that reason, I believe we have a special obligation to make sure that Congress intended to authorize a novel assertion of federal criminal jurisdiction. Cf. *Bell* v. *United States*, 462 U. S. 356, 363 (1983) (STEVENS, J., dissenting); *McElroy* v. *United States*, 455 U. S. 642, 675 (1982) (STEVENS, J., dissenting); *United States* v. *Altobella*, 442

---

[19] The Government stated at oral argument that § 2114 was activated in this case instead of § 2112 because the former section covers attempted robbery. Tr. of Oral Arg. 31. However, in its brief the Government concedes that it was not without statutory relief because 18 U. S. C. § 111 prohibits assaults on Government employees or officials listed in 18 U. S. C. § 1114, which includes "any officer or employee of the Secret Service." A conviction under § 111, if involving a deadly or dangerous weapon, carries a fine of not more than $10,000, or imprisonment of 10 years, or both. Jose Garcia was convicted of violating 18 U. S. C. § 111, and the Court of Appeals affirmed the conviction. 718 F. 2d 1528, 1530 (1983).

[20] At oral argument, the Government stated that § 2114 covers the robbery of a hammer that is Government property. See Tr. of Oral Arg. 25.

[21] *Id.*, at 26.

F. 2d 310, 316 (CA7 1971).   There is, of course, no doubt that Congress has the authority to enact a law with the meaning the Court finds in § 2114 today.   I am not, however, convinced that Congress actually intended to do so.   I therefore respectfully dissent.