**In re UNITED PRESS INTERNATIONAL, INC., Debtor.**

**Bankruptcy No. 91–13955.**

United States Bankruptcy Court, S.D. New York.

Sept. 24, 1991.

Remy J. Ferrario, Prokauer, Rose, Goetz & Mendelsohn, New York City, for United Press Intern., Inc.

Joseph S. Fine, Reitman, Parsonnett & Duggan, Newark, N.J., Gen. Counsel, for respondent Wire Service Guild (Guild).

Matthew Siembieda, Regina Stango–Kelbon, Barry F. Bevacqua, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., Special Labor Counsel, for debtor/movant United Press Intern., Inc. (UPI).

Bruce H. Simon, Cohen, Weiss & Simon, New York City, for Wire Service Guild.

David Wander, Angel & Frankel, New York City, for Infotechnology, Inc.

## MEMORANDUM OF DECISION ON 11 U.S.C. § 1113(e) MOTION

FRANCIS G. CONRAD *, Bankruptcy Judge.

This matter [1] is before us on an emergency 11 U.S.C. § 1113(e) [2] motion [3] filed by UPI on September 19, 1991. An evidentiary hearing was conducted on September 20, 1991. Based upon the evidence, stipulations, and representations of the parties, we find that UPI has met the heavy burden required under § 1113(e) for most of the relief requested (wage reduction, stringers, and severance), but has failed to carry its burden regarding employee bumping and *nunc pro tunc* relief.

How this matter arrived to be heard by this Court is an interesting procedural story that we lay out in order to create a better understanding of the motion.

UPI was founded in 1907 and is one of the world's largest major news agencies. Doubtless, most Americans have heard of UPI; certainly everyone has read at least one of its produced stories. It offers a variety of news products that cover areas of interest for media and non-media subscribers.

---

* Sitting by special designation.

1. We have jurisdiction to hear this matter under 28 U.S.C. § 1334(b) and the general reference to this Court. This is a core matter under 28 U.S.C. § 157(b)(2)(A). This Memorandum of Decision constitutes findings of fact and conclusions of law under F.R.Civ.P. 52, as made applicable by Federal Rules of Bankruptcy Procedure Rule 7052.

2. 11 U.S.C. § 1113(e), **Rejection of collective bargaining agreements,** provides:
 (e) If during a period when the collective bargaining agreement continues in effect, and if essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate, the court, after notice and a hearing, may authorize the trustee to implement interim changes in the terms, conditions, wages, benefits, or work rules provided by a collective bargaining agreement. Any hearing under this paragraph shall be scheduled in accordance with the needs of the trustee. The implementation of such interim changes shall not render the application for rejection moot.

3. The filed motion was styled "Order to Show Cause." An order to show cause in the Southern District of New York is usually issued after an application, typically ex parte, requesting some action after a shortened notice period. In the matter before us, Guild had less than 24 hours notice to prepare for the September 20, 1991 hearing.

UPI's business structure consists of over 50 bureaus located throughout the United States. Its foreign operations are divided into five divisions. Each division is responsible for the approximately 47 bureaus within its jurisdiction.

UPI employs approximately 598 people, of which 360 are located in the continental United States. This is down significantly from UPI's 1984 total of about 1,850 employees. The foreign operations are not factually involved in the motion before us.

On April 28, 1985, UPI's predecessor filed a voluntary petition under Title 11, United States Code, in the District of Columbia. A plan of reorganization was confirmed in 1986, and we are told it is substantially consummated. The official committee of unsecured creditors in the 1985 case still exists.

On August 28, 1991, UPI filed a second Title 11 case in this Court [4] because it continued to suffer significant losses in spite of significant wage concessions made by employees in months prior to the filing. As of this date, no trustee has been appointed. UPI operates as a debtor in possession. An official committee of unsecured creditors was appointed early in the afternoon of September 20, 1991.

On August 28, 1991, the 1985 official committee filed, in the District of Columbia, a Federal Rules of Bankruptcy Procedure Rule (F.R.Bankr.P.) 1014(b) [5] motion to change venue from the Southern District of New York to the District of Columbia. The filing of a F.R.Bankr.P. 1014(b) motion stays all proceedings in other districts unless otherwise ordered by the Court in which the first case is filed. Due to the Bankruptcy Courts' backlog in the District of Columbia, a § 1113(e) hearing could not be conducted until October 15, 1991. Appropriate pleadings for reference withdrawal were filed with the District Court for the District of Columbia to lift the Rule 1014(b) stay for the specific purpose of allowing this Court to hear the § 1113(e) motion. On September 19, 1991, the District Court lifted the stay, allowing us to hear UPI's § 1113(e) motion.

UPI seeks in its § 1113(e) motion to change the following Articles in a June 28, 1990 Collective Bargaining Agreement (CBA):

1) Article XI (Wages and Profit Sharing), § 1 of the CBA shall be changed nunc pro tunc to September 14, 1991 so as to maintain employee wages at their 80% pre-September 15th level. This request is for an indefinite length of time, but data presented is only through November 29, 1991.

2) Article XIX (Dismissal Indemnity) of the CBA dealing with severance pay shall be changed to suspend the article and render it unenforceable against UPI.

3) Article I (Recognition/Jurisdiction), § 3 of the CBA shall be modified to allow "stringers" [6] to work regularly in UPI's bureaus.

4) Article V (Employee Security), § 3(b) of the CBA shall be modified nunc pro tunc to September 14, 1991 to prevent "bumping" [7] by employees.

---

**4.** The case was commenced in the Southern District of New York primarily because the Chapter 11 case of UPI's parent, Infotechnology, Inc., and its affiliate, Financial News Network, Inc., are both pending in the Southern District of New York.

**5.** F.R.Bankr.P. Rule 1014(b), **Procedure when petitions involving the same debtor or related debtors are filed in different courts,** provides:

(b) If petitions commencing cases under the Code are filed in different districts by or against (1) the same debtor, or (2) a partnership and one or more of its general partners, or (3) two or more general partners, or (4) a debtor and an affiliate, on motion filed in the district in which the first petition is filed and after hearing on notice to the petitioners and other entities as directed by the court, the court may determine, in the interest of justice or for the convenience of the parties, the district or districts in which the case or cases should proceed. Except as otherwise ordered by the court in the district in which the first petition is filed, the proceedings on the other petitions shall be stayed by the courts in which they have been filed until the determination is made.

**6.** "Stringers" are essentially freelance reporters who generally sell their stories for a low fee.

**7.** "Bumping" is a labor term of art that allows senior people who are transferred or who have their positions eliminated to "bump" junior people from their positions.

UPI casts the relief sought as interim in nature. But based on UPI's already announced lay-offs, the only relief requested that is interim in nature is the wage reduction. All other relief requested may well be final and permanent to those employees affected. Guild opposes the relief requested, except for the wage reduction.

UPI and Guild have a history of wage concessions going back to 1984 and pre-the first Chapter 11 filing. The latest round of wage concessions started in November, 1990 when the parties agreed to a 35% wage cut for three months. This cut was apparently precipitated by UPI's parent, Infotechnology, Inc., who in November, 1990 announced it would no longer fund[8] UPI's losses. Rather, UPI was to become a stand-alone company.

The November, 1990 wage concession was to expire on February 14, 1991. Prior to the expiration date, UPI requested another wage cut. This time the cut was for 30% for two months and 25% for two additional months. Guild was also informed during this latest request that UPI had hired an investment banker to find a buyer. Guild conceded to the cuts.

In May, 1990, and just prior to the reinstatement of full wages, Guild received another phone call from UPI requesting another cut. This time the cuts would be 25% for two months and 20% for an additional two months. The reinstatement of full wages would occur on September 15, 1991. Guild was told this would be the last trip to the well.

Unfortunately, it was not the last trip to the well because we have, in the form of a § 1113(e) motion, not only another wage concession request, but the presentment of a bigger bucket by UPI.

At the September 20, 1991 hearing, UPI presented, through its controller, a mishmash of information that can be charitably characterized as financial stew. We understand Guild's confusion with the data presented. Like most stews, however, there are usually a few chunks of meat. The data here is no exception.

UPI's controller presented cash flows from September 20 through November 29, 1991. Debtor's 3. With the relief requested in effect, UPI would reduce its estimated cash deficit from $897,000 to $34,000, an estimated savings of $863,000.

We also received two exhibits, Debtor's 4 and Union's 1, that show UPI operating at a profit after all the concessions (wage reductions and employee cutbacks) are in effect from $6,000 to $3,000 a month. We are unable, however, to connect any of the data in Debtor's 3 with Debtor's 4 or Union's 1.

For instance, the October, 1991 payroll cash flows on Debtor's 3 show $944,000, but Debtor's 4 show projected payroll cash flows of $959,000. While the difference is immaterial in the payroll category, there is not one expense category in Debtor's 3 & 4 that can be connected to the other. As a result, we are required to recast the confusing but uncontradicted data about the cash flows from the controller's oral testimony. We discuss the evidence in the order of the relief requested.

According to the controller, maintaining wages at an 80% level will save $600,000. There are six pay dates between September 20 and November 29, 1991, so the savings is roughly $300,000 per month or ⅕ of monthly receipts. Payroll comprises a majority of UPI's total costs. The wage reduction is a significant savings and one to which the Guild is not opposed. It will be granted from September 20, 1991 through November 29, 1991. The *nunc pro tunc* relief is denied for failure of proof.

If the dismissal indemnity (severance) request is effectuated, the savings will be $810,000. At first we were led to believe this was included in the cash flows through November 29, 1991. Maybe it was in the controller's mind when he prepared the cash flow exhibits, but it cannot be so because the CBA, Article XIX, pg. 39, (b), provides that the "dismissal indemnity shall be paid to the dismissed employee in bi-weekly payments equivalent to regular

---

8. Infotechnology's funding of UPI was in excess of $50 million, although we understood UPI's controller to state only $8 million was due on an inter-company payable.

bi-weekly pay until the full amount of entitlement has been exhausted." Thus, any severance on suspension could continue for months beyond November 29, 1991.

The implementation of stringers, according to UPI's cash flow exhibit, shows no increase in cost through November 29, 1991. This cannot be reality because UPI intends to replace many employees with stringers. To do this, there must be a concomitant incremental increase. Other evidence shows this amount to be about $26,000 per month. The dollar amount of the increase is probably not reliable. But, in any event, it is clear the incremental increase will not materially affect cash flow.

UPI was unable to provide any financial data about the result of its requested bumping change. We did learn that bumping is controlled to some extent by a 1978 arbitration decision that allows a senior person to bump a junior person based upon demonstrated abilities and not potential ability. It would appear that this mechanism requires a careful evaluation of a senior employee, but which does not guarantee a bump into a new position. Clearly, there would be a cost benefit to having a less experienced and lower paid person in a position as compared to a higher paid senior employee. But on the other hand, there are intangibles from experience that cannot be measured. UPI provided no evidence on the bumping issue.

There are several issues, procedural and substantive, that must be decided. Guild has raised due process arguments about the short notice for this hearing and whether it can be held at all without a § 1113 motion to reject the CBA.

The issues to be decided in the motion before us rise squarely from the ever existing tension between management and labor, exacerbated by the economic illness of the debtor.

Substantively, Guild argues that UPI has not met the required burden of proof under § 1113(e), namely, UPI did not show irreparable damage to the estate or that the changes requested are essential to the continuation of UPI's business. Stated another way, will UPI's business collapse without out the immediate relief requested? We address the issues in the order presented.

Congress enacted 11 U.S.C. § 1113 as part of the 1984 Amendments to the Bankruptcy Code in response to the Supreme Court's decision in *N.L.R.B. v. Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). Unions decried and business applauded that decision. Bills were introduced both pre- and post-*Bildisco* by pro-union and pro-management congressmen and senators anticipating and reacting to *Bildisco*. The bills were caught up in the debate over the jurisdiction Bankruptcy Courts were to have after the Supreme Court's decision in *Northern Pipeline Construction Co. v. Marathon Pipeline*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). *See generally,* Rosenberg, *Bankruptcy and the Collective Bargaining Agreement—A Brief Lesson in the Use of the Constitutional System of Checks and Balances,* 58 Am.Bankr.L.J. 293 (1984).

One result of the rush and confusion over the issue is that we have no committee reports, which are the "authoritative source for finding the Legislature's intent." *Garcia v. United States,* 469 U.S. 70, 76, 105 S.Ct. 479, 483, 83 L.Ed.2d 472 (1984). What legislative history there is consists of comments in the Congressional record by individual members of Congress. *See,* 5 *Collier on Bankruptcy* § 1113.01(1) (15th ed.) 1986; 130 Cong.Rec. H7494–96 (daily ed. June 29, 1984); 130 Cong.Rec. § 8897–8900 (daily ed. June 29, 1984). Guild, in its trial memorandum, relies extensively on these comments in its opposition to UPI's motion. A cursory reading of the individual statements reveals divergent views about the effect of *Bildisco*. These "snippets" of legislative debate do not reflect the collective intent of Congress. *Garcia v. United States, supra,* 469 U.S. at 76, 105 S.Ct. at 483. Moreover, "where, as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *United States v. Ron Pair Enterprises,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) (quoting, *Caminetti v. United States,* 242

U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917). In the matter before us, the intent is clear that § 1113(e) is an interim relief provision that gives Bankruptcy Courts the flexibility to carry out the purpose of Chapter 11 and do whatever is necessary to prevent irreparable damage and assist the continuation of a debtor's business. *See generally,* Gibson, *The New Law on Rejections of Collective Bargaining Agreements in Chapter 11; An Analysis of 11 USC § 1113,* 58 Am.Bankr.L.J. 325 (1984). With these thoughts in mind, we turn to the specific issues raised by the parties.

■ The first issue raised by Guild is the short period of time it had to prepare for the September 20, 1991 hearing. Guild claims this affects its due process rights.

There can be no doubt speed permeates § 1113. In subsection (d), Congress mandates an expedited process of decision that, unless the parties agree otherwise, could conceivably be complete within 24 days. For the legal system, and especially a labor dispute, this is a rapid adjudication. The subsection (e) interim relief provision, unlike (d), is not as specific. Here, Congress determined that a hearing under subsection (e) shall be scheduled in accordance with the needs of the trustee. This could be a rapid or a seasoned determination. The purpose of subsection (e) is to allow a Court sufficient flexibility to provide the debtor in possession temporary economic relief in order to carry out the objective of Chapter 11; that is, to preserve the business, if possible, for the benefit of all. *See, In re Salt Creek Freightways,* 46 B.R. 347, 351 (Bkrtcy.D.Wy.1985); *In re Evans Products Co.,* 55 B.R. 231, 233–234 (Bkrtcy.S.D.Fl.1985); 130 Cong.Rec. H7495 (daily ed. June 29, 1984) (remarks of Rep. Lungren); *Gibson, supra,* at 330–31.

There is no doubt Congress debated the issue. Pro-labor senators, such as Packwood and Kennedy, opposed § 1113(e). Cong.Rec., *supra,* at § 8898–99. Conservative senators, like Thurmond, supported § 1113(e). Cong.Rec., *supra,* at § 8888. Section 1113(e) was what was ultimately enacted. Thus, we can only conclude that Congress, by enacting § 1113(e), intended that due process be granted to a union, but that such due process could be on short notice so as to serve the trustee's needs.

■ The second issue raised by Guild is whether UPI can even have a § 1113(e) hearing without first seeking rejection of the CBA. We think UPI can seek interim relief without first seeking permanent relief in the form of CBA rejection, because the only requirement in the statute is that the application be made "during a period when the collective bargaining agreement continues in effect." 11 USC § 1113(e).

The handful of Courts that have considered the issue have not imposed the requirement that a motion to reject a collective bargaining agreement precede the application for interim relief. *Beckley Coal Min. v. United Mine Workers of America,* 98 B.R. 690, 695–96 (D.De.1988). The Court in *In re Salt Creek, supra,* 46 B.R. at 348 reached the same conclusion, based on the plain language of the statute. To the same effect is *In re Evans Products Co., supra,* where the Court, without discussion, allowed interim relief even though no application to reject had been filed.

■ The purpose of subsection (e) is to allow flexibility at a critical juncture of the Chapter 11 process. Actions taken one way guarantee liquidation; actions taken another way may lead to reorganization. The window of time is usually quite narrow. As the *Beckley* Court said:[9]

> After all, it is only interim relief ... that is being sought. The terms and conditions are neither terminated nor permanently altered. Conditioning such relief would also comply with the provisions of subsection (f). Finally, a court granting relief under subsection (e) may retain jurisdiction over the parties ... to modify the alternatives granted if the situation lends itself to such.

*Beckley Coal Min. v. United Mine Workers of America, supra,* 98 B.R. at 695. (Citations omitted).

---

**9.** Although the holding in *Beckley* is *dicta,* we adopt it as a holding in this decision.

Thus, we hold that the plain language of § 1113(e), in light of its purpose, namely, interim relief, allows a debtor in possession to apply for interim relief at any time without first making a § 1113(b)(1)(A) proposal or providing § 1113(b)(1)(B) data, or without meeting with the authorized representatives under § 1113(b)(2).

The third issue in this matter is the burden of proof. Guild argues that in this Circuit a debtor seeking interim relief must establish that: (1) the company will collapse without such immediate relief, (2) the relief is temporary, (3) the relief will be effective only until a decision is rendered on a pending § 1113 rejection, and (4) the relief does not exceed changes proposed to the union in the required bargaining prior to a motion to reject. Guild's objection, at pp. 1–2.

Guild relies on *Truck Drivers Local 807 v. Carey Transportation*, 816 F.2d 82, 89 (2d Cir.1987). *Carey*, however, involved the rejection of a collective bargaining agreement, not § 1113(e). And when the *Carey* Court referred to § 1113(e), it was criticizing a Third Circuit case, *Wheeling–Pittsburgh Steel Corp. v. United Steelworkers*, 791 F.2d 1074 (3d Cir.1986), and contrasting the difference between interim relief requests and post-petition modification. *Carey, supra,* at 816 F.2d at 89. The *Carey* comment was gratuitous and probably *dicta.*

The burden of proof under § 1113(e) is statutory. A Court may authorize a trustee to implement interim changes in the terms, conditions, wages, benefits, or work rules provided by a collective bargaining agreement if it is essential to the continuation of the debtor's business, or to avoid irreparable damage to the estate. 11 U.S.C. § 1113(e).

There is a difference between the continuation of the debtor's business and irreparable damage to the estate. The § 1113(e) evidentiary standards are in the disjunctive because there is a distinction. Therefore, a debtor need only meet one of the statutory standards without having met the other. In the matter before us, the irreparable harm to the estate is not before

us, but the continuation of UPI's business is. Thus, we discuss what is meant by "essential" to the continuation of the debtor's business.

The term "essential" in § 1113(e) refers to interim relief that should be limited to the bare minimum, short-term requirements for the debtor's immediate survival. *In re Royal Composing Room, Inc.,* 62 B.R. 403, 418, 15 C.B.C.2d 1 (Bkrtcy.S.D.N.Y.1986), aff'd, 78 B.R. 671 (S.D.N.Y.1987). This view was received favorably, albeit in *dicta* by *Carey, supra,* 816 F.2d at 89. What is essential to one debtor may not be essential to another debtor. Therefore, the "essential" changes proposed by a debtor must be scrutinized on a case by case basis measured against whether a debtor will collapse without the change. Evaluation of this evidence is not always an easy task for the Court because the debtor will almost inevitably be able to meet this burden through the testimony of a financial officer who, in turn, is usually subjected to hastily prepared and formulated cross-examination. But there is other criteria important to § 1113(e), and that is the nature of the relief.

Any § 1113(e) relief must, by its nature, be temporary. This is not to say that it may not continue for longer than two months, as *Carey* seems to imply, nor does it mean it cannot have permanent consequences. For instance, a lay off, which is interim in nature, may have long-term consequences. In appropriate circumstances, and upon a proper showing, a Bankruptcy Court can approve an interim lay off under § 1113(e) with the parties to negotiate the permanent or long-term consequences under § 1113(b). In the instant case, we have precisely that situation regarding severance payments.

UPI wants to eliminate severance payments to laid off employees. Over the short run, because of its pressing cash needs, this is appropriate. Over the long run, it may not be appropriate for at least two reasons. First, employees who are being retained will be equally affected by a severance pay elimination, and, second, be-

cause the severance payments can be made over a period as long as a year, this is a subject that can be discussed more fully during § 1113(b) negotiation. Congress did not intend, by § 1113(e), for the Bankruptcy Judge to be a labor mediator or negotiator. It knows we are not experts in labor law or collective bargaining. It knows we cannot give the time to ensure an openly negotiated and frank discussion of the terms and conditions of employment *vis a vis* a debtor and its employees. What it does know is that we can evaluate dire economic illness and mold appropriate remedies until the parties who know the situation best are able to evaluate the data. Hence, Congress, through § 1113(e), is clearly attempting to balance the conflicting demands of bankruptcy and labor policy.

 Guild also asks that we limit the relief sought to changes proposed to the union in the required bargain period prior to rejection. We don't think this request makes sense. Section 1113 does not require a debtor in possession to reject a collective bargaining agreement. Nor does § 1113 require an immediate application be made. If we were to wait until proposals were made to a union, a debtor would never get to file a § 1113(e) motion, nor would we ever get to rule. Guild's request is analogous to a shipwrecked sailor who saves rationed water to see whether it compares to the quality of water obtainable on an island an unknown distance away. The correct standard is an evaluation of the proposals on a matrix that measures their qualitative and quantitative effect over a short period of time, but with their ultimate effect, if possible, to be resolved at the bargaining table. Based upon our discussion, we now apply the law to the facts.

 Guild has no opposition to the wage concession. UPI has requested indefinite wage concessions, but presented no evidence supporting concessions beyond November 29, 1991. The wage concession may remain in effect until November 29, 1991, subject to any further agreement by the parties. The *nunc pro tunc* effect of the wage concession will be denied because of a failure of proof.

 UPI has met its burden of proof concerning the stringers. Its proposed employee lay off will require replacement reporters. It is a request that is temporary in nature and surely will be the subject of intensive bargaining. It may remain in effect until November 29, 1991, or until the collective bargaining agreement is rejected.

UPI has met its burden as to the severance payments, but because the relief will extend beyond any reasonable § 1113 period, we limit the relief until November 29, 1991, or until the collective bargaining agreement is rejected.

 UPI's request to eliminate bumping is denied in its entirety. UPI was unable to quantify the effect of eliminating bumping and, thus, has not met its burden. Moreover, there is already in place a demonstrated ability practice that protects UPI and Guild.