**In re ALMAC'S INC., Debtor.**

**Bankruptcy No. 93–12090.**

United States Bankruptcy Court, D. Rhode Island.

Oct. 15, 1993.

Edward J. Bertozzi, Jr., Edwards & Angell, Providence, RI, for debtor.

Warren H. Pyle, Angoff, Goldman, Manning, Pyle, Wanger & Hiatt, P.C., Boston, MA, for United Food and Commercial Workers' Union Local 328.

Allan M. Shine, Winograd, Shine & Zacks, P.C., Providence, RI, for Wetterau.

Michael A. Silverstein, Hinckley, Allen & Snyder, Providence, RI, for Creditors' Committee.

Steven M. Ellis, Goodwin, Procter & Hoar, Boston, MA, for Bondholders' Comm.

Office of the U.S. Trustee, Sheryl Serreze, Boston, MA.

## DECISION AND ORDER

ARTHUR N. VOTOLATO, Bankruptcy Judge.

Heard on October 8 and 15, 1993, on the Debtor's emergency motion for an order authorizing it to implement interim changes to the terms, conditions, wages, benefits or work rules provided under the collective bargaining agreement (the "Agreement" or "Contract") between it and the United Food and Commercial Workers' Union Local 328 ("the Union"), pursuant to 11 U.S.C. § 1113(e). The Union vigorously opposes any modification of the Union contract at this time, particularly concerning wage cuts.

■ Specifically, the Debtor is requesting two interim modifications to the Agreement, effective *immediately:* (1) a fifteen percent (15%) reduction in the wages of all employees covered by the Contract; and (2) that employees downgraded from full-time to part-time positions receive part-time wages and reduced benefits, then reduced by fifteen percent.

To satisfy its burden under § 1113(e) for the requested modifications, the Debtor must establish that the relief it seeks is "essential to the continuation of the Debtor's business, or in order to avoid irreparable damage to the estate. . . ." 11 U.S.C. § 1113(e); *see also, In re United Press Int'l, Inc.,* 134 B.R. 507, 514 (Bankr. S.D.N.Y.1991); *In re Salt Creek Freightways,* 46 B.R. 347, 350 (Bankr.D.Wyo.1985); *In re Wright Air Lines, Inc.,* 44 B.R. 744, 745 (Bankr.N.D.Ohio 1984).

After hearing, we are left with uncontradicted and unimpeached testimony and documentary evidence which establishes by a clear and convincing margin that the requested modifications are not only essential to the continued operations of Almac's, but are vital to any hope of a successful reorganization. The Debtor has also demonstrated that such changes are necessary to avoid irreparable damage to the estate (i.e. the almost immediate shutdown of the entire grocery store chain). These findings and conclusions are based upon actual figures to date, as well as the unrefuted projections of operations through December, 1993.[1] The Debtor has represented, and it is echoed by its major supplier, Wetterau, that without the requested relief Almac's will be forced to cease its operations by the end of this month.[2]

■ The Union focuses almost exclusively on the hardship that will be felt by the Almac's' employees from *any* wage or benefit reduction ordered in these difficult economic times. The Court is genuinely sympathetic with this concern, but given the *undeniable* alternative of a complete loss

---

1. According to two members of Wetterau's top management, Edward Brouillet and James Campbell, Almac's' projections for the months of November and December are overly optimistic and, even with a fifteen percent employee pay cut and benefit decreases, these reductions will not stop the losses entirely.

2. Wetterau has expressed its intention to file a motion to convert the case to Chapter 7 if present losses of $200,000 per week are not immediately controlled.

of all jobs by the union employees, as well as the nonunion management staff (who voluntarily took a 15% cut in September[3]), the lesser of the two evils is most definitely the proposed ten week, fifteen percent pay cut and benefit reduction. Although as a legal matter the Court does not find § 1113(e) to contain *hardship* as a defense to a debtor's proposed modification based upon survival, we do believe there is an implicit requirement for the debtor to demonstrate that the proposed modification is the most reasonable, just and cost effective measure it can take to avoid imminent liquidation.[4] Given this test, the unrefuted evidence before us, and the fact that the Union has presented no alternate proposal to reduce losses, we find that Almac's has satisfied its § 1113(e) burden.[5]

In the absence of offering contradictory or rebuttal evidence to the Debtor's case, Union counsel has attempted to manipulate the actual figures, to no avail however, and his refusal to recognize the gravity of the situation is counterproductive to his clients' cause. The actual and projected losses of the company since its filing for bankruptcy on August 6 are as follows:

| | |
|---|---|
| Four weeks ended 9/4/93 | — Loss of $539,000; |
| Four weeks ended 10/2/93 | — Loss of $539,000; |
| Four weeks ended 10/30/93 | — Loss of $839,000; |
| Four weeks ended 11/27/93 | — Loss of $1,056,000; |
| Four weeks ended 12/25/93 | — Loss of $877,000; |
| TOTAL POSTPETITION LOSS: | $3,850,000.[6] |

3. In this case, management has voluntarily agreed to a number of concessions to assist Almac's in cutting costs and to help stop the financial bleeding of the company, including: (1) a five percent wage reduction in August; (2) an additional ten percent cut in September; (3) the giving up of one week's vacation time; (4) a two year wage freeze on store managers and customer service personnel; and (5) a reduction of twenty employees in administrative staff. To date, the Union has made no concessions, and as far as this Court is aware, has come forth with no reasonable suggestions or offers to assist the Debtor through this financial crisis. On the contrary, the evidence is that the employees, concerned over the likelihood of an abrupt shutdown of the company, are using sick and vacation time as it accumulates, which further erodes the Debtor's financial condition, and its ability to reorganize.

4. In other cases, this Court has ordered across the board reduction of all employee compensa-

Despite being furnished with such alarming financial information, the Union chooses to ignore the facts and puts its head in the sand while embarking on a fictional odyssey, i.e. that things are not as dire as portrayed by the Debtor. The Union is basically asking that all concerned, including the company, its employees, Wetterau, over $12 Million in trade debt creditors, the shareholders, and this Court, just sit still, and wait, to see what happens—(without any change in Union wages or benefits, however) while the Company loses $200,000 per week, and with only $500,000 in cash reserves remaining at month's end. It is painfully obvious that without the requested emergency relief, Almac's will be out of business within two to three weeks. The willingness of the Union leadership to gamble that the Debtor's figures are untruthful or grossly inaccurate represents a disservice to the employees, and is not in their best interest at this time.

Finally, there has been a great deal of discussion about the Debtor's concept of the "community of pain" to be shared by all interested parties, and that the proposed temporary wage and benefit modifications constitute the employees' share in this pain. The Union attempts to spurn this theory by mischaracterizing facts involving other creditors, as well as the professionals

tion, union and nonunion. Here, the nonunion employees voluntarily took such cuts two months ago.

5. In this regard, we find that the labor costs of the Debtor, vis-a-vis the industry average, are disproportionately high, and contribute in a major way to the Company's continued unprofitability, and that the situation is exacerbated by store closings, layoffs and "bumping"—all of which result in a higher hourly wage, and fewer service personnel.

6. The source of funds to cover these enormous shortages, is money that Almac's failed to pay its leading vendor, Wetterau, for product delivered the week prior to the filing. Without this $4 Million, Almac's would probably have been forced to shut down in August, with *all* employees losing their jobs three months ago.

in the case.[7] Based upon all of the evidence, we simply cannot accept the Union's argument on this point and remind the Union that substantial creditors of this estate have taken substantial hits already, and likely will be required to endure even more financial pain. Wetterau, for instance, is owed in excess of $8 Million and the unsecured creditors are collectively owed $12 Million. We cannot imagine that such losses are not "painful" to these creditors.

Based upon the record before us (the Union has offered no direct evidence), the issue boils down to the following: Which is worse—being required to accept a *temporary* 15% wage cut plus benefit reductions, which at least would allow for the possibility of reorganization, or to see all of the Almac's' jobs disappear immediately and permanently? This question answers itself.

Accordingly, considering the critical and still worsening cash position of Almac's, together with the fact that vendors and suppliers will stop shipments upon any default, we find that the Debtor has clearly met its burden under § 1113(e). Its business plan is due by November 1, 1993, and in the circumstances a fast track plan and disclosure statement will certainly be expected.

■ The Union has also argued that if the Debtor is granted all or part of the relief it seeks, then the employees should be given a "super-priority" lien under 11 U.S.C. § 1113(f) for the value of the concessions they were forced to make, thereby protecting their interests in the event of a liquidation. We conclude that § 1113(f) does not create a super-priority lien in these circumstance, and to the extent that

our ruling in *In re Coast to Coast Construction Co., Inc.*, BK. No. 93–10463 (Bankr.D.R.I. March 22, 1993) is inconsistent with our ruling herein, *In re Coast to Coast*, is overruled.[8]

Section 1113(f) states, "[n]o provision of this title shall be construed to permit a trustee to *unilaterally* terminate or alter any provisions of a collective bargaining agreement *prior to compliance with the provisions of this section.*" 11 U.S.C. § 1113(f) (emphasis added). In cases where employees were given either a super-priority or priority lien, the debtor was attempting to modify the collective bargaining agreement *unilaterally*, without bankruptcy court authorization for interim modifications under § 1113(e) or court approval to reject a union contract under § 1113(c). *See, e.g., United Steelworkers v. Unimet Corp. (In Unimet Corp.)*, 842 F.2d 879 (6th Cir.), *cert. den.* 488 U.S. 828, 109 S.Ct. 81, 102 L.Ed.2d 57 (1988); *In re Arlene's Sportswear, Inc.*, 140 B.R. 25 (Bankr.D.Mass.1992); *In re Golden Distribs., Ltd.*, 134 B.R. 760 (Bankr.S.D.N.Y. 1991), *aff'd* 152 B.R. 35 (S.D.N.Y.1992).

In the instant case, the requested interim modifications have not been unilaterally implemented by the Debtor, but rather are authorized by this Court as a result of the Debtor's compliance with § 1113(e). Thus, the granting of a super-priority lien in this instance is not warranted by § 1113(f) or by applicable case law.

Accordingly, the Debtor's request for authority to modify the collective bargaining agreement according to the terms described in its September 16, 1993 proposal to the Union is GRANTED, and the Union's

---

7. The Union's argument that Almac's would be profitable but for the additional expense of the bankruptcy administration, is rejected. Certainly these costs were not present when Almac's was forced to file Chapter 11 in August. Without professionals administering the case, there can be no hope of a successful reorganization and the jobs will be lost for sure, and to suggest that professionals should be dispensed with or expected to perform services without compensation really deserves no comment. The reality in this case is that the results obtained by the

Debtor, with the assistance and expertise of the professionals, is the only hope that the employees have to keep their jobs with Almac's.

8. Lest we appear capricious, it should be noted that our granting of a super-priority in *Coast to Coast* was limited to a liquidation scenario, and was not available upon a successful reorganization. Moreover, in that case we were not provided with any persuasive legal authority or argument in opposition to the Union's request.

request for a super-priority lien is DE-NIED.

Enter Judgment consistent with this opinion.