**In re ALMACS, INC., Debtor.**

**Bankruptcy No. 93–12090.**

United States Bankruptcy Court,
D. Rhode Island.

July 1, 1994.

Edward Bertozzi, Steven Kumins, Edwards & Angell, Providence, RI, Robert Lapowsky, Cohen, Shapiro, Polisher, Sheikman & Cohen, Philadelphia, PA, for debtor.

Allan Shine, Winograd, Shine & Zacks, P.C., Providence, RI, for SuperValue.

Office of the U.S. Trustee, Sheryl Serreze, Providence RI.

---

**2.** The "posters" are not part of the record, but Mr. Richardson will certainly recall their presence.

Warren H. Pyle, Angoff, Goldman, Manning, Pyle, Wanger & Hiatt, P.C., Boston, MA, for United Food and Commercial Workers' Union Local 328.

## ORDER MODIFYING AND EXTENDING COLLECTIVE BARGAINING AGREEMENT

ARTHUR N. VOTOLATO, Bankruptcy Judge.

Heard on June 28, 1994, on the Debtor's Motion for Order Extending Modification of Collective Bargaining Agreement, and on the objection of the United Food and Commercial Workers' Union, Local 328 ("the Union"). As background, in our first encounter with this subject matter on October 15, 1993, we ordered: (1) a temporary 15% pay cut for all employees covered by Almacs' collective bargaining agreement; and (2) that all employees shifted from full-time to part-time status receive part-time wages and benefits. When we first extended the October Order on January 18, 1994, we also changed the wage reduction from 15% to 12%, and continued the modifications in all other respects through March 31, 1994. On March 28, 1994, we entered yet a third Order extending the interim modifications, including the 12% wage reduction, through June 30, 1994. The Debtor is now before us a fourth time, seeking another extension of these modifications through September 30, 1994.

The Union objects to a further continuation of the existing pay cut, and also requests that the Debtor be ordered to pay a 4% wage increase which, it argues, became effective on June 5, 1994, pursuant to the terms of the existing collective bargaining agreement.[1]

When this issue was first litigated in October 1993, we were viewing the problem in a totally different context. At that time the Debtor had been in Chapter 11 for only a few

months, and was severely hemorrhaging financially, with very little cash flow. We ruled after the first hearing that without the requested modifications the Debtor would be forced to close its doors within two to three weeks, and that the Union was not allowing the Debtor a reasonable opportunity to get its act together. *See In re Almac's,* 159 B.R. 665, 667 (Bankr.D.R.I.1993). In October 1993, the Debtor easily met its burden to obtain *temporary interim* relief under 11 U.S.C. § 1113(e). Now, nearly one year and three extensions later, that burden has not changed and thus, the Debtor still must demonstrate that the "relief it seeks is 'essential to the continuation of the Debtor's business, or in order to avoid irreparable damage to the estate....'" *Id.* at 666 (quoting 11 U.S.C. § 1113(e)).

The Debtor contends that it continues to sustain operating losses. With "reorganization costs" being squirreled away by the Debtor at the rate of $100,000 per week, however, and with approximately $1.5 Million in various cash drawers, etc., its cash position is probably better than it was last year. For the second quarter ending June 25, 1994, the Debtor projected an ending cash balance of $1,707,000, but actual cash for the period was far better than predicted, at $2,948,000.

The Debtor's president, Thomas Ireland, testified that the reason the Company ended with more cash than projected was primarily because certain reorganization costs that had accrued during the second quarter were not paid. He also stated that a 4% increase in wages will cost Almacs an additional $350,000 for the next three months, and that if the wage concessions are continued as requested, this will result in a total savings of over Five Million Dollars to Almacs since its Chapter 11 filing. Ireland concedes that the 4% increase will not put the Debtor out of business, but he maintains that the Debtor will need every dollar it can get its hands on in

---

1. The Union contends that under our previous Orders, this provision should have become operative automatically on June 5, 1994. Additionally, there is a "reopener" provision in the collective bargaining agreement requiring the Debtor and the Union to renegotiate the amount of the Debtor's contribution to the Health and Welfare fund. If an agreement is not reached by July 1,

1994, the contract allows the workers to picket *and strike.* Since neither the Debtor nor the employees wish to see a lockout or a strike at this time, the parties will agree to extend the reopener for an additional 90 days beyond the deadline. We do not address either of these issues here, but will resolve them if and when Court intervention is necessary.

order to cover the costs associated with plan confirmation ($2.5–$3.0 Million). He projects that if confirmation takes place by the end of September 1994, and if the wage cut remains at 12%, Almacs will have only $2.12 Million on hand. Notwithstanding this shortfall, even with the concessions, Ireland believes the Company will have to find some way to cover this difference.

The Debtor and all creditor constituencies recommend, in unison, that the wage cuts remain in force, and that the employees should continue to "share in the community of pain," as it has come to be known in this case. The creditor groups urge the Court to continue the wage concessions in effect because, as they say, while they have all come on board in a unified effort to assist in the Debtor's rehabilitation, the Union continues to hold out, and this hinders the reorganization. This argument is disingenuous and transparent.

The stark reality here is that the fate of the various creditor groups was sealed as of the filing date,[2] and their total realistic range of choices of what to do in this case consists of—wait and see what happens, i.e. not one of them has opted to move for relief from stay, conversion, or for any other relief that might rock the boat. So it is predictable that they continue to look to the employees who have been forced to finance this operation to the tune of nearly $5 Million, to date. The constituencies are all resigned to their respective, predetermined positions as mere spectators, unless either an investor or a potential purchaser is found to alter the present bleak financial situation.

In any event, while we await the arrival of this elusive savior, only the employees have been required to continue to work a full day for less than a full day's pay. It appears that, over time, the ongoing financial burden of supporting the operation of the Debtor has been shifted almost completely to the employees, who have been forewarned that, even in a "successful" reorganization, they will be required to accept substantially lower wages and benefits than they are presently receiving. What was fair, reasonable *and temporary* last September, is no longer fair and reasonable, nor necessary to avoid irreparable damage.

Having said all this, partly as encouragement for the employees to keep up the hard work under difficult circumstances, we do find that the Debtor has established that *some continued modification* of the collective bargaining agreement is essential in order to prevent irreparable damage to the Estate (i.e. immediate liquidation), and for the continuation of the Debtor's business. As it has in prior hearings, the Debtor overwhelmed us again with projections and actual financial information (Debtor's Exs. 6 through 15) in documentary and testimonial form, and we have emerged from that deluge of information with the belief that, in light of the variables and unforeseen obstacles that continue to confront the Debtor, the figures are helpful but by no means absolute, conclusive, or controlling.

Accordingly, based upon the entire record in this case, we find that a 9% reduction in the wage level in effect in September 1993, is reasonable through September 30, 1994, and that this will not cause irreparable harm to the Debtor. We also order that: the Debtor pay the $2.35 per employee increase on the pension fund contribution scheduled to go into effect on July 1, 1994;[3] (see Debtor's Ex. 1 Agreement, at 71); and that all employees downgraded from full-time to part-time status receive part-time wages (as reduced by 9%) and part-time benefits, as well.

---

**2.** Every class of creditor in this case (with the exception, possibly, of SuperValue) is fully aware of the disaster that would result from the closing of the business, and liquidation. They are financially dead and on a temporary life support system, which of course consists of the continued operation of the business. Since the employees are key to this critical objective, they are entitled to deference *at least* equal to other constituencies whose interests are so far under water that they have no clout whatsoever in the present scheme.

**3.** Mr. Ireland testified that this would result in an expense to the Company of $4,000 for the period ending September 30, 1994.